Debra MacDONALD, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 92–25–VAL (WDO).

United States District Court,
M.D. Georgia,
Valdosta Division.

April 13, 1994.

J. Converse Bright, Valdosta, GA, Michael P. Curreri, Rodney K. Adams, Mark S. Brennan, Sr., Richmond, VA, for plaintiff Debra MacDonald.

Lillian Harris Lockary, Macon, GA, for defendant U.S.

## ORDER

OWENS, Chief Judge.

On December 14, 1993, this court held a non-jury trial in the above-captioned case. Plaintiff alleges that defendant, through its agents, negligently failed to properly investigate, diagnose, and treat plaintiff's hypothyroidism, hypercholesterolemia, and coronary artery disease. Plaintiff also alleges that defendant, through its agents, negligently failed to supervise physician's assistants charged with plaintiff's care, and negligently failed to provide thrombolytic therapy in its emergency room at Moody Air Force Base. After careful consideration of the arguments of counsel, the relevant case law, and the

record as a whole, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACTS

During the period between May 29, 1986, and January 29, 1989, Robert MacDonald, an active duty member of the United States Air Force, was stationed at Moody Air Force Base ("Moody AFB") in Valdosta, Georgia. Plaintiff Debra MacDonald is the wife of Robert MacDonald. Plaintiff, as the dependent of an active duty member of the United States Air Force, was entitled to medical treatment and benefits from military health care providers for the period between May 29, 1986, and January 29, 1989. Prior to being transferred to Moody AFB, Robert MacDonald was stationed at Hill Air Force Base ("Hill AFB") in Utah from 1980 until May 1986. Plaintiff, as a dependent of Robert MacDonald, was entitled to medical treatment and benefits from the medical care providers at Hill AFB during the period between 1980 and May 1986. While at Hill AFB, plaintiff sought medical treatment on numerous occasions from the military health care providers on base. Records of the visits were maintained by Hill AFB. In 1986, when Robert MacDonald was assigned to Moody AFB, plaintiff's outpatient medical records from Hill AFB were transferred to Moody AFB and were available to the health care providers at Moody AFB.

On August 31, 1987, plaintiff visited the Primary Care Clinic at Moody AFB. At the clinic, plaintiff presented numerous complaints to the physician's assistant on duty, Captain Gregory M. Beach. Plaintiff complained of a sore right leg, dry patches on the right leg, arm and stomach, a rash over the right calf, and warts. Plaintiff also informed Captain Beach that she had previously been diagnosed with a hiatal hernia. She told Captain Beach that her previous physicians had treated her hiatal hernia with Tagamet and Maalox, and that her prescription had run out. Captain Beach, therefore, wrote plaintiff a new prescription. The record for the August 31, 1987 visit reflects that at the

time of the visit, plaintiff was thirty-three (33) years old, a smoker, weighed one hundred and seventy three (173) pounds, and had blood pressure of 130/88. Captain Beach diagnosed plaintiff as having soft tissue damage, xerosis, and warts. Captain Beach treated plaintiff for these problems and sent her home.

Early on the morning of June 4, 1988, plaintiff went to the emergency room at Moody AFB Hospital. Plaintiff complained of stomach pain, vomiting, diarrhea, and hip pain. Further, plaintiff told the physician on duty, Captain Gilbert Rogers, that the vomiting and diarrhea were aggravating her hiatal hernia. Captain Rogers diagnosed plaintiff as suffering from chronic nausea and recommended to plaintiff a follow up visit to the primary care clinic for a work-up. Captain Rogers, however, did not review plaintiff's prior outpatient records. The record for the June 4, 1988 visit reflects that at the time of the visit plaintiff's blood pressure was 122/80. Plaintiff's visit lasted five minutes and was categorized as non-urgent.

On June 17, 1988, plaintiff again visited the Moody AFB Primary Care Clinic. Plaintiff complained to the physician's assistant on duty, Lieutenant Ronald Malcom, of pain in her hip and side, and continued pain in the area of her hiatal hernia. Plaintiff was diagnosed with dyspepsia,[1] possibly secondary to reflux and smoking, and bursitis in her right hip. Lieutenant Malcom prescribed Tagamet four times a day with Mylanta and Motrin. Further, Malcom advised plaintiff to stop smoking and to enter the tobacco cessation clinic. The record for the June 17, 1988 visit reflects that at the time of the visit plaintiff weighed one hundred and sixty six (166) pounds, and had blood pressure of 130/90.

On September 8, 1988, plaintiff returned to the Moody AFB Primary Care Clinic for a follow up on her hip and hiatal hernia complaints. Plaintiff indicated to Malcom that her hip felt better. However, plaintiff told Malcom that her stomach symptoms had worsened and complained of full stomach bloating and heartburn. Malcom diagnosed

---

1. Dyspepsia is defined as "indigestion or upset stomach." Stedman's Medical Dictionary 22 ed. at 386.

plaintiff as suffering from a hiatal hernia with reflux. Malcom prescribed Tagamet, Reglan and Mylanta, ordered an upper GI, and recommended that plaintiff stop smoking. In addition, Malcom reviewed plaintiff's hip complaints with Captain Ronald Kalchik, Malcom's supervising physician. As a result of Dr. Kalchik's review, Malcom recommended a CT scan and a follow up of plaintiff's x-rays. The record for the September 8, 1988 visit reflects that at the time of the visit plaintiff was still smoking, weighed one hundred and seventy one (171) pounds, and had blood pressure of 130/82.

On October 7, 1988, plaintiff visited the Moody AFB primary care clinic for another follow-up of on her hip and stomach complaints. As on plaintiff's two prior visits, Captain Ronald Malcom was the physician's assistant on duty. Plaintiff told Malcom that the antacids and Tagamet had provided some relief for her stomach problems. An upper GI indicated a hiatal hernia with probable reflux, and probable duodenitis. As a result of his evaluation, Malcom prescribed additional Tagamet, Mylanta, and a follow-up examination with Dr. Kalchik to evaluate plaintiff's hip and to suggest any further treatment. Malcom also told plaintiff to stop smoking, lose weight, and avoid unnecessary foods. The record for the October 7, 1988 visit reflects that at the time of the visit plaintiff was still smoking, weighed one hundred and sixty-eight (168) pounds, and had blood pressure of 112/62. On October 12, 1988, Dr. Kalchik performed a follow-up examination of plaintiff. Plaintiff reported to Dr. Kalchik that her hip was feeling better. Dr. Kalchik noted in plaintiff's record that plaintiff was moderately overweight and suggested increased activity to lose the weight. The record for the October 12, 1988 visit indicates that plaintiff was still a smoker, weighed one hundred and seventy-nine (179) pounds, and had blood pressure of 138/98.

At approximately 8:00 a.m., on January 29, 1989, plaintiff awoke with severe upper abdominal pain. Thinking that the pain was caused by her hiatal hernia, plaintiff tried several measures to reduce the pain. However, when the pain did not abate, plaintiff went to the emergency room at Moody AFB Hospital. Plaintiff arrived at the emergency room at 11:33 a.m. complaining of a "crunching" pain in her upper abdomen that radiated up her neck and down her arms. Shortly after arriving plaintiff was given a "GI cocktail," consisting of sixty (60) cc's of Mylanta, ten (10) cc's of Donnatal, and ten (10) cc's of viscus Lidocaine. The physician on duty, Dr. Kimball Beck, then decided to have an x-ray abdominal series taken and sent plaintiff to the x-ray room. However, because an x-ray technician was not on duty that morning, plaintiff had to wait while a standby technician was called in to the emergency room. Eventually, a technician arrived and x-rays were taken. After examining the x-rays, Dr. Beck concluded that the source of plaintiff's pain was constipation and gave plaintiff a laxative. Dr. Beck then told plaintiff she could go home. Plaintiff, however, refused and insisted that she was in too much pain to return home. After further examination, Dr. Beck ordered an EKG at 12:55 p.m. Dr. Beck also ordered cardiac enzymes. The EKG revealed that plaintiff was suffering an evolving myocardial infarction. At this point, Dr. Beck contacted South Georgia Medical Center ("SGMC") to arrange a transfer of plaintiff to that facility. The transfer to SGMC was necessary because SGMC was capable of providing plaintiff with the thrombolytic therapy necessary to treat plaintiff's myocardial infarction. This therapy was not available at Moody.

Department of Defense directive 6000.-10(F)(1)(b) provides:

Each Military Department shall direct its CONUS MTFs [Medical Treatment Facilities] and outside of CONUS, when appropriate, to initiate written working agreements with the surrounding medical treatment facilities. The working agreements shall specify the requirements for patient referral and transfer, the mutual support disaster plan, and the means of communication among facilities.

Moody AFB Hospital, however, did not have a written agreement with SGMC governing the transfer of patients.

To arrange the transfer to SGMC, Dr. Beck contacted Dr. Richard Nijem, the cardiologist on staff at SGMC. Dr. Nijem, how-

ever, felt the situation was not life-threatening and refused to accept plaintiff. Dr. Beck then contacted Dr. Raymond Noel, the internist on call at SGMC, and arranged for plaintiff's transfer to SGMC. Plaintiff was transferred to SGMC at 1:10 p.m.

Upon arriving at SGMC, however, plaintiff was not provided with thrombolytic therapy. Despite Dr. Beck's conclusion that plaintiff was suffering a myocardial infarction, Dr. Noel initially treated plaintiff for her perceived hiatal hernia condition. Only then did Dr. Noel attempt to rule out the possibility of a myocardial infarction. However, by the time SGMC determined that plaintiff was in fact suffering a myocardial infarction, the window of opportunity for administering thrombolytic therapy had passed. A subsequent examination revealed that plaintiff had suffered an acute anterior apical myocardial infarction.

On January 25, 1991, plaintiff filed an administrative claim for injury with the United States Air Force. Plaintiff listed January 29, 1989—the date of plaintiff's myocardial infarction—as the date of her injury. In the section of the administrative form entitled "basis of claim," plaintiff indicated that the series of events giving rise to her claim began on June 17, 1988, the date of her first examination by physician's assistant Ronald Malcom, and ran through the date of her emergency room visit on January 29, 1989. Plaintiff requested four million (4,000,000.00) dollars for damages suffered as a result of defendant's failure to diagnose her heart condition. Plaintiff's claim was denied by the Air Force on September 12, 1991. On March 2, 1992, plaintiff filed suit against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). Plaintiff asserted that the negligence of the United States Air Force proximately caused plaintiff to suffer irreparable damage to her heart and to her health.

The findings of fact set forth above are those facts giving rise to plaintiff's cause of action. The trial testimony of expert witnesses as to whether defendant satisfied the appropriate standard of care will be addressed within the conclusions of law.

## CONCLUSIONS OF LAW

### I. Scope

On November 20, 1992, this court granted defendant's motion for summary judgment on the issue that only those claims encompassed within the scope of plaintiff's administrative complaint were within the jurisdiction of the court, 807 F.Supp. 775. In addition, the court granted defendant's motion for summary judgment on the issue that Dr. Kimball Beck was an independent contractor, and not a federal employee, for purposes of the FTCA. Accordingly, in analyzing plaintiff's claims, this court is limited to a review of those events taking place between June 17, 1988, and October 12, 1988. These dates reflect both the scope of plaintiff's administrative claim and the exclusion of any acts or omissions on the part of Dr. Beck that might serve as a basis for defendant's liability. This holding also prevents the court from finding liability on the part of the United States based on an act or omission of any health care provider at Hill AFB. This limited scope, however, does not prevent the court from determining whether the failure to provide thrombolytic therapy violated the required standard of care. This issue fell well within the claims set forth in plaintiff's administrative complaint. Further, the resolution of this issue would not require the court to find defendant liable based on any negligent act or omission on the part of Dr. Beck.

### II. Federal Tort Claims Act

28 U.S.C. § 1346(b) provides, in part:

[T]he district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred.*

28 U.S.C. § 1346(b) (emphasis added). The acts that formed the basis of plaintiff's claim

against the United States took place within the State of Georgia. Accordingly, the law of the State of Georgia governs the disposition of this action.

### III. Medical Malpractice

Official Code of Georgia Annotated section 51–1–27 provides:

> A person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which recovery may be had.

O.C.G.A. § 51–1–27. To establish a claim for medical malpractice, a plaintiff must prove: (1) the duty of the health care provider; (2) "the breach of that duty by failing to exercise the requisite degree of skill and care"; and (3) that the failure to exercise such skill and care was the proximate cause of the injury sustained. *McClure v. Clayton County Hospital Authority,* 176 Ga.App. 414, 418, 336 S.E.2d 268, 272 (1985).

### A. Duty

■ To establish liability for medical malpractice, a plaintiff must first prove that a duty existed on the part of the health care provider " 'to conform to a standard of conduct raised by the law for the protection of others....' " *Bradley Center, Inc. v. Wessner,* 250 Ga. 199, 200, 296 S.E.2d 693, 695 (1982). As a dependent of an active duty member of the United States Air Force, plaintiff was entitled to medical treatment and benefits from military health care providers. Defendant, therefore, had a duty to conform to a standard of conduct raised by the law for the protection of plaintiff.

In Georgia, the standard of care applicable to health care providers is that degree of care and skill, as established by medical testimony, that, under similar conditions and like surrounding circumstances, is ordinarily employed by the profession generally. *See Blount v. Moore,* 159 Ga.App. 80, 81, 282 S.E.2d 720, 721 (1981); *Wagner v. Timms,* 158 Ga.App. 538, 538, 281 S.E.2d 295, 296 (1981). Accordingly, a duty existed on the part of Moody AFB to provide plaintiff medical treatment that conformed to the standard set forth above.

### B. Breach of duty

Plaintiff contends that defendant breached the standard of care as follows:

(1) That the physicians and physician's assistants employed by defendant negligently failed to diagnose and/or treat plaintiff's hypothyroidism;

(2) That the physicians and physician's assistants employed by defendant negligently failed to diagnose and/or treat plaintiff's hypercholesterolemia;

(3) That the physicians and physician's assistants employed by defendant negligently failed to diagnose and/or treat plaintiff's heart disease;

(4) That the physicians employed by defendant negligently supervised the physician's assistants employed by defendant; and

(5) That defendant negligently failed to provide thrombolytic therapy.

■ *Hypothyroidism.* Plaintiff contends that the physicians and physician's assistants employed at Moody AFB negligently failed to diagnose her hypothyroidism. The record lends no support to this contention. Both plaintiff's expert and defendant's expert testified that plaintiff did not exhibit the classic symptoms of hypothyroidism prior to her myocardial infarction on January 29, 1989. Plaintiff's expert testified that the dry patch of skin which plaintiff complained of on August 31, 1987, should have caused physician's assistant Beach to explore further the possibility of hypothyroidism. The court, however, finds the testimony of defendant's expert persuasive on this issue. As defendant's expert testified: "She [had no] evidence of hypothyroidism[.] There's no radecardia, slow heart rate, there's no low temperature, there's no blood pressure alterations, there's no hair loss, there's no [generalized] skin changes. There's nothing mentioned anywhere in this record that would say anything that would go along with [hypothyroidism]." (Trial Tr. at 515.) The court holds that the physicians and physician's assistants employed by defendant did not breach the stan-

dard of care in failing to diagnose plaintiff's hypothyroidism.

■ *Hypercholesterolemia.* According to plaintiff, the medical care providers at Moody AFB did not meet the required standard of care in that they failed to diagnose plaintiff's hypercholesterolemia and then failed to exclude its secondary causes. According to plaintiff's expert:

[Plaintiff's] ratio in 1982 of LDL to HDL was eight. One of the highest ratios I've seen certainly in this age group. It is very high and when you look at that ratio, it is a one and one thousand ratio, only one twenty-seven year old woman in a thousand would have a ration that high. Once again, it's off the map, it's dangerous, *and any reasonable physician looking at this chart, doing a proper chart review, or any reasonable P.A., would know that he had to repeat the test, that he had to find out why and that was not done.*

(Trial Tr. at 198.) Plaintiff's medical records clearly indicated that plaintiff had a "markedly elevated" total cholesterol that should have been addressed by the medical care providers at Moody AFB. A proper review of plaintiff's medical records would have brought this problem forward for analysis and treatment. No such review, however, was conducted. Accordingly, the court holds that the physicians and physician's assistants employed by defendant at Moody AFB breached the standard of care by failing to diagnosis plaintiff's hypercholesterolemia.

■ *Heart disease.* Plaintiff contends that the medical care providers at Moody AFB failed to properly diagnose and treat her heart disease. According to plaintiff's expert, "there was a failure on the part of the physicians and physician's assistants at Moody Air Force Base to properly evaluate a patient with chest pain." (Trial Tr. at 157.) For example, plaintiff's expert testified that when plaintiff presented at Moody AFB Primary Care Clinic on June 17, 1993 complaining of pain from her hiatal hernia, Lieutenant Malcom failed to properly evaluate and investigate her complaints. (Trial Tr. at 216.) According to the expert, a proper evaluation of plaintiff's complaints would have included a chart review. (Trial Tr. at 216.)

[T]he standard of care requires that the primary care physician review the chart. He has got to go back and look at everything that has happened with that patient that could be conceivably of any relevance to the issues at hand. And the issues at hand is the whole patient, and so, in a thirty-three year old woman with not a very large chart, the whole chart is relevant and the physician must review it, the physician or P.A. must review the chart, particularly when its a new-patient visit, a patient he's never seen before. *The standard of care absolutely dictates that.*

(Trial Tr. at 189.)

Plaintiff's expert testified that when a patient complains of persistent pain or discomfort from "stomach bloating" ör "heart burn," it is particularly important that the medical care provider properly determine the source of the pain or discomfort. (Trial Tr. at 169.)

One of the most significant differentials for evaluating chest pain is determining whether the pain that the patient has is due to their esophagus or due to their heart. One of the reasons that this is confusing is that the nerve that serves as the pain-sensing nerve of the heart, it's called the vagus nerve, and it enervates the heart and will go back up to the brain and when the heart is having ischemia, it will tell the brain that "I'm having angina," and the patient will sense that as pain. That same nerve, the vagus nerve, also enervates the esophagus, and so when the esophagus is having pain, it also goes up to the brain and says, "I'm having pain" and it's—unlike the surface of the body where you can feel pain in certain places, you really can't, so the location and nature of the pain, esophageal versus heart, can often be quite similar.

(Trial Tr. at 170.) Further,

[Y]ou need to do an evaluation, you need to take a .careful history from the patient. There are many other structures in the chest that can give you pain or discomfort. One of the most prominent is the esophagus.... [T]he lining of the lungs are a common pain-generating source in the chest. The lining of the heart ... is also a

pain-generating source. So, how do you tell the difference between the two or between the two—between all of those? You need to take a very, very careful history, a detailed history of what that patient's chest pain is like, what brings it on, what relieves it, what helps make it better, at what time of day it comes on, what associations the patient has, how long they've had it, is it getting worse, that sort of thing. (Trial Tr. at 168–69.)

Plaintiff's expert also testified that the failure of the medical care providers at Moody AFB to diagnose plaintiff's hypercholesterolemia contributed to their breach of the standard of care in failing to diagnose plaintiff's heart disease. According to plaintiff's expert, "the specific recommendations for patients having hypercholesterolemia, that is, total cholesterol over the ninety-fifth percentile, including Mrs. MacDonald, [are] to do a physical exam, looking for physical signs of hypercholesterolemia[,] *and to consider possible coronary heart disease.*" (Trial Tr. at 202.) In addition, the expert stated that the medical care providers breached the standard of care by ignoring the fact that plaintiff had "borderline diastolic hypertension," a risk factor for coronary disease. (Trial Tr. at 157, 200.)

According to plaintiff's expert, the failure to conduct a review of plaintiff's medical charts, the failure to investigate the source of plaintiff's pain[2], the failure to diagnose plaintiff's hypercholesterolemia, and the failure to

diagnose plaintiff's hypertension was a breach of the standard of care. The expert stated that if the medical care providers at Moody AFB had properly evaluated plaintiff, the source of plaintiff's pain would have been traced to coronary artery disease and appropriately treated.

Defendant's expert, however, testified that the medical care providers at Moody AFB did not breach the standard of care in failing to diagnose plaintiff's heart disease. (Trial Tr. at 506.) The crux of the expert's testimony was that plaintiff did not present any complaints or symptoms to the health care providers at Moody AFB that should have alerted them to a possibility of heart disease. (Trial Tr. at 518, 530, 537.)[3] On cross-examination, however, defendant's expert acknowledged that if a patient comes into a primary care setting complaining of a "hiatal hernia," the standard of care requires the medical care providers to make their own diagnosis, including a history of the pain, its location, what brings it on, how long the patient has had the pain, and whether any medications relieve the pain. (Trial Tr. at 579, 580.) Further, the expert conceded that if a patient's records are available to the medical care provider, the standard of care requires the provider to examine those records. (Trial Tr. at 579, 580.)[4]

After a careful examination of the testimony of both experts, the court finds that the medical care providers at Moody AFB Primary Care Clinic breached the standard of

2. According to plaintiff's expert, the fact that the record for the October 7, 1988 visit reflects an UGI indicating a hiatal hernia with probable reflux and probable duodenitis does not adequately address the physician's assistant's duty to discover the source of plaintiff's persistent pain in this area. (Trial Tr. at 222–23.) An UGI, according to the expert, is only "the beginning of a proper GI work-up . . . ." (Trial Tr. at 223.)

3. The following is a portion of defendant's direct examination of its expert:

Q: And you've also testified, I think, . . . that you didn't find any complaints that should've alerted the Moody providers to a potential heart problem?
A: That is correct.

. . . . .

Q: [D]id the standard of care in 1987, '88, require the Moody providers to undertake a

cardiac work-up based on the symptoms that you've seen in this chart?
A: I do not feel that was in order from the record.
(Trial Tr. at 537.)

4. The following exchange took place between plaintiff's counsel and defendant's expert:

Q: And another factor that might relate to or result in below standard of care medical treatment for a patient is that a physician might rely on another physician's prior diagnosis without fully assessing it him or herself?
A: That can happen. I mean, certainly, that does happen sometimes.
Q: And it's one of the main things in medical school that physicians, such as you, are taught [not to do.]
A: Don't trust another person's opinion; *you make your own on every point, that's correct.*
(Trial Tr. at 590.)

care required of the profession in failing to diagnose and/or treat plaintiff's heart disease. The medical care providers failed to take a proper medical history from plaintiff, failed to properly review plaintiff's medical records, failed to independently diagnose the source of plaintiff's recurrent pain, failed to address plaintiff's hypertension, and failed to address plaintiff's hypercholesterolemia. As a result of these omissions, plaintiff's heart disease went undiagnosed and untreated. In the pretrial order, defendant wrote that "none of the treating physicians at Moody suspected that plaintiff might be a candidate for coronary artery disease." (Pretrial Order at 16.) The court finds it difficult to believe that the medical care providers at Moody AFB could examine an overweight smoker with a history of high blood pressure, high cholesterol, and recurrent chest pain, and not find that person to be a candidate for coronary artery disease.

■ *Supervision of physician's assistants.* Plaintiff asserts that the physicians at Moody AFB Primary Care Clinic failed to properly supervise the actions of the physician's assistants under their control. According to plaintiff's expert, "a physician assistant needs oversight; that is, the patient— his evaluation of the patient and his treatment of the patient needs consistent, steady oversight and that, to me, means *every case is reviewed,* that the standard of care would require that every case is reviewed." (Trial Tr. at 218.) Defendant's expert did not directly address the standard of care governing the supervision of physician's assistants. However, in response to a question from the court, defendant's expert did testify that it is acceptable for a physician's assistant to act as a substitute for a physician in a primary care setting. (Trial Tr. at 641.)[5]

At trial, Ronald Malcom testified that as a physician's assistant at Moody AFB Primary Care Clinic, he was under the direct supervision of Dr. Ronald Kalchik. Malcom stated that early each morning, before the clinic opened, the physician's assistants and the supervising physicians met "to discuss inter-

esting cases, [and] review a few records that were brought up." (Trial Tr. at 407.) During the day, the supervising physicians would be available to the physician's assistants if questions needed to be answered. If a physician's assistant noticed a patient with a recurrent problem, they were required to consult with the supervising physician. As a general rule, quality assurance checks were made by the supervising physicians on approximately ten percent of the patients treated by the physician's assistants during the day. (Trial Tr. at 408.)

The record reflects that the supervising physicians at Moody AFB reviewed the physician's assistants' assessments of plaintiff only upon specific request or referral by the physician's assistants. The record does not indicate that plaintiff's assessments fell within the random ten percent oversight review. Plaintiff's expert testified that a review of this type falls below the required standard of care. Although defendant's expert testified that a physician's assistant is an acceptable substitute for a doctor, the court disagrees. Two years of study as a physician's assistant does not operate as a sufficient substitute for the extensive study and training required to become a doctor. It is because doctors have undergone this extensive study and training that they have the responsibility to perform adequate oversight over physician's assistants in their charge. In this case, the oversight required by the standard of care was missing. A random review of approximately ten percent of all patients treated in the clinic is not sufficient. Such a review allows the physician's assistant to substitute his judgment for that of a doctor's. Accordingly, the court finds that the supervising physicians at Moody AFB breached the standard of care by failing to adequately supervise the physician's assistants under their control.

■ *Thrombolytic therapy.* Plaintiff contends that the failure of Moody AFB Primary Care Clinic to provide or have available thrombolytic therapy fell below the standard of care required of such facilities. In support of her contention, plaintiff has cited the

---

5. According to Gregory Beach, a two year training program is required in order to become qualified as a physician's assistant. The first

year consists of classroom work, and the second year involves rotations through a variety of clinics. (Trial Tr. at 366.)

court to Department of Defense Directive 6000.10, which provides:

> Beneficiaries shall have access or referral to emergency medical services for treatment of patient care emergencies. All MTFs (medical treatment facilities) shall have the capability to determine if a patient care emergency exists *and to initiate life and limb saving measures before transporting the patient* or providing definitive treatment.

There is no dispute among the parties that thrombolytic therapy is a "life and limb saving measure[.]" The parties do dispute, however, whether in 1988 and 1989 the standard of care required its availability at facilities such as Moody AFB. According to plaintiff's expert, the standard of care in 1988 and 1989 required a facility such as Moody AFB Primary Care Clinic to provide thrombolytic therapy to patients diagnosed with an myocardial infarction. (Trial Tr. at 228.) Defendant's expert testified that in 1988 and 1989 thrombolytic therapy had not yet advanced to the stage at which a facility such as Moody AFB was required by the standard of care to have it available. (Trial Tr. at 566.) According to defendant's expert, "it was basically optional to the facility." (Trial Tr. at 566.) [6] In addition, defendant contends that a "level 3" emergency facility such as Moody AFB Primary Care Clinic was not required by JCAH standards to provide thrombolytic therapy.

It is clear from the trial testimony of Dr. Gregory Rogers and Dr. Benjamin Wilds, Jr., and the deposition testimony of Dr. Ronald Kalchik, that thrombolytic therapy was available in 1988 and was considered for use by Moody AFB. For a variety of reasons, however, Moody AFB made a decision not to have thrombolytic therapy available in its emergency facility.

Whether or not defense department regulations or JCAH requirements did or did not require the availability of thrombolytic therapy does not necessarily answer the question before the court; that is, did the standard of care for an emergency room facility require the availability of thrombolytic therapy in 1988 and 1989? [7] Although the defense regulations and JCAH requirements may offer some guidance on this issue, they are by no means outcome determinative. Further, although the testimony of Doctor Rogers, Doctor Wilds, and Doctor Kalchik indicates that they were aware of the availability of thrombolytic therapy, that does not necessarily mean that the standard of care in 1988 and 1989 required its availability at an emergency facility. It is the trial testimony of expert witnesses that provides the basis for this determination. Therefore, after a careful review of the record and the testimony of both experts, the court finds that the standard of care in January of 1989 required a facility holding itself out as an emergency room to have available the use of thrombolytic therapy. The failure of Moody AFB to provide

---

6. Plaintiff also contends that the failure to institute a written agreement with SGMC governing the transfer of patients did not violate Department of Defense directive 6000.10(F)(1)(b). Plaintiff asserts that the "when appropriate" language contained in the directive makes such written agreements discretionary. Plaintiff insists that an "informal agreement" existed between Moody AFB and SGMC and that the informal agreement satisfactorily established a procedure for the transfer of patients between the two facilities. The record, however, belies this contention. Although Dr. Benjamin Wilds, Chief of Hospital Services at Moody AFB, testified that an "informal agreement" did exist between the facilities, he also testified that Moody AFB has at times had difficulty arranging the transfer of a patient to SGMC pursuant to the informal agreement. (Wilds Dep. at 71, 98–99.) In light of the unreliable nature of Moody AFB's informal agreement, a written agreement pursuant to directive 6000.10(F)(1)(b) should have existed be-

tween the two facilities. Furthermore, Dr. Richard Nijem, a cardiologist with SGMC, testified in his deposition that no agreement, written or unwritten, existed between Moody AFB and SGMC regarding the transfer of cardiac patients to SGMC for "backup coverage." (Nijem Dep. at 91.) In fact, Dr. Nijem testified that Moody AFB refused to institute an agreement concerning coverage of cardiac patients even after Dr. Nijem personally approached the administrators at Moody AFB about instituting such a policy. (Nijem Dep. at 91–97.)

7. Further, defendant does not contend that plaintiff and her husband were aware of the fact that the Moody AFB emergency room was only a "level 3" facility and that such facilities did not provide thrombolytic therapy. Whether JCAH requirements did or did not obligate Moody AFB to provide thrombolytic therapy is of little import if plaintiff was not aware of such requirements.

such treatment was a breach of the standard of care applicable in 1989. The court notes that this holding is in no way based on any act or omission on the part of Dr. Kimball Beck, the emergency room physician on duty on January 29, 1989. The holding is based solely on the finding that in 1989 the standard of care required the availability of thrombolytic therapy at facilities such as the Moody AFB emergency room. This standard of care operates independent of any acts or omissions on the part of Dr. Beck.

### C. Causation

■ The final element of a medical malpractice claim under Georgia law requires a plaintiff to prove that the failure of the defendant to exercise the requisite degree of skill and care was the proximate cause of an injury sustained by the plaintiff. *McClure,* 176 Ga.App. at 418, 336 S.E.2d at 272.

***Heart disease.***[8] According to plaintiff's expert:

> [H]ad the Moody physicians met their standard of care and worked up—properly worked up and properly evaluated Mrs. MacDonald ..., either properly have worked her up for the possibility of angina pectoris or properly worked up her elevated cholesterol ..., or if they had even properly worked up her possibility of GI pain, any of those would have led them to the correct diagnosis that her pain was due to coronary disease and would have led to proper therapy, would have prevented her myocardial infarction.

. . . . .

***To a reasonable degree of medical probability, Mrs. MacDonald's myocardial infarction was preventable and should have been prevented had proper care been given.***

(Trial Tr. at 244–45.) Further, plaintiff's expert testified that if plaintiff's heart condition had been timely diagnosed, several methods of treatment were available. (Trial Tr. at 177.) Defendant's expert, however, testified that even if plaintiff had been diagnosed with coronary artery disease, her treatment would have been extremely limited, given the symptoms she presented. (Trial Tr. at 549.)

The court finds that if plaintiff had been diagnosed and treated at Moody AFB for heart disease, prior to January 29, 1989, it is more probable than not that her myocardial infarction would have been prevented. Accordingly, the court finds that defendant's failure to diagnose and treat plaintiff's heart disease proximately caused plaintiff's injury—that is, her myocardial infarction. The court is not required to find as an absolute certainty that plaintiff would not have had a myocardial infarction if properly diagnosed and treated. The law simply requires that plaintiff establish this element by a preponderance of the evidence. Plaintiff has met this burden.[9]

■ ***Thrombolytic therapy.*** This case presents two issues of causation. First, did any acts or omissions on the part of defendant or its agents cause plaintiff's myocardial infarction. The court has answered that question in the affirmative. Second, once plaintiff's myocardial infarction started, did the failure of defendant to provide thrombolytic therapy cause the extensive heart damage plaintiff suffered. The first causation issue addresses the acts of defendant and its agents *prior* to the myocardial infarction;

---

8. There is no evidence that the failure to diagnose plaintiff's hypercholesterolemia in and of itself resulted in some identifiable injury to plaintiff. It is relevant, however, in determining whether the failure to identify plaintiff's heart disease resulted in an identifiable injury and will, therefore, be discussed in that context. In addition, the failure of the supervising physician at Moody AFB Primary Care Clinic to properly supervise the treating physician's assistants will also be considered in the context of causation as it relates to the failure to diagnose and treat plaintiff's heart disease.

Finally, as the court has already found that defendant did not breach the standard of care in failing to diagnose plaintiff's hypothyroidism, there is no need to address causation as it relates to plaintiff's claim on that issue.

9. Even if the court had found that the failure to diagnose and treat plaintiff's heart disease prior to January 29, 1989 would not have prevented plaintiff's myocardial infarction, the court would still have found that plaintiff endured needless pain and suffering from the disease itself, completely independent of any damages suffered as a result of her myocardial infarction.

the second causation issue examines the actions of defendant and its agents *while* the myocardial infarction took place.

The issue before the court is whether defendant's failure to provide thrombolytic therapy caused any damage to plaintiff's heart beyond the pain and suffering attributable to the myocardial infarction. Thrombolytic therapy does not prevent a myocardial infarction; it merely stops a myocardial infarction that is already in progress. (Trial Tr. at 181.) There is no question that plaintiff suffered extensive heart damage as a consequence of her myocardial infarction. The court must resolve how much of that damage, if any, is attributable to defendant.

As discussed above, defendant's failure to diagnose and treat plaintiff's heart disease was the proximate cause of plaintiff's myocardial infarction. Defendant, however, asserts that the failure to have thrombolytic therapy available at Moody AFB was not the proximate cause of the injuries plaintiff suffered as a result of her myocardial infarction. That is, defendant contends that it should not be held liable for the extensive nature of the injury to plaintiff's heart.

According to defendant's expert, when plaintiff arrived at South Georgia Medical Center ("SGMC"), plaintiff was still well within the window of opportunity for the administration of thrombolytic therapy. Defendant contends that if SGMC had properly administered thrombolytic therapy, plaintiff's extensive heart damage could have been avoided.

Plaintiff, however, asserts that the failure of SGMC to provide thrombolytic therapy did not violate the standard of care for the profession. Plaintiff's expert testified that when plaintiff reached SGMC, she was at the outer edges of, if not beyond, the window of opportunity for administering thrombolytic therapy. According to the expert, under those circumstances, the failure to administer thrombolytic therapy did not breach the standard of care. However, assuming that SGMC was negligent, plaintiff contends that such negligence did not operate as an intervening cause. Further, according to plaintiff, because defendant was negligent in failing to provide thrombolytic therapy, the subsequent negligence of SGMC is also attributable to defendant.

■ Therefore, as a threshold matter, the court must determine whether the failure of SGMC to provide thrombolytic therapy fell below the standard of care for the profession. According to plaintiff's expert,

> by the time [plaintiff] reach[ed] South Georgia Medical Center, it was entirely a matter of individual judgment, whether or not you would give thrombolytic therapy. She was basically outside the window of opportunity as it was understood in 1989 and you could've given thrombolytic therapy at South Georgia or not. So, the delay [at Moody AFB] basically took her opportunity to get thrombolytic therapy, took it away from her.

(Trial Tr. at 226–27.) The expert testified that although plaintiff did not exhibit elevated creatine kinase ("CK") until 2:40 p.m., this does not necessarily indicate that she was within the window of opportunity when she arrived at SGMC. (Trial Tr. at 227.) The expert stated that CK does not begin to rise above normal until four to six hours after the onset of a myocardial infarction. Therefore, because the window of opportunity for thrombolytic therapy is four to six hours after onset (Trial Tr. at 184), plaintiff was at or beyond that window when she arrived at SGMC. According to plaintiff's expert, "continuous, unremitting pain is what the physician uses to onset the time for the window of opportunity to give thrombolytic therapy." (Trial tr. at 306.) Plaintiff testified that she began to suffer "continuous, unremitting pain" at approximately 8:00 a.m. on January 29, 1989. Therefore, plaintiff's expert stated that the onset of the window of opportunity was approximately 8:00 a.m. or shortly thereafter.

Defendant's expert, however, testified that the onset of the window of opportunity for thrombolytic therapy occurred late in the morning on January 29, 1989, and that plaintiff was well within the window when she arrived at SGMC. (Trial tr. at 571–72.) According to the expert, "[t]he window of opportunity existed for at least several hours, two, three, four hours after she got to South

Georgia Medical Center and was not given lytic therapy." (Trial tr. at 572.)

The court finds the testimony of plaintiff's expert more persuasive on this issue. However, even accepting this testimony, the facts reveal that plaintiff arrived at SGMC within the window of opportunity. Plaintiff arrived at SGMC at 1:30 p.m. Accepting 8:00 a.m. as the onset of the window of opportunity, plaintiff would have been within her fifth hour when she arrived at SGMC. However, the physician at the SGMC emergency room failed to accept Moody AFB's evaluation of plaintiff as suffering a myocardial infarction and proceeded to treat plaintiff as a GI patient. Because of this delay, plaintiff was well outside the window of opportunity when her myocardial infarction was eventually discovered by SGMC. Accordingly, the court finds that the actions of SGMC, in failing to provide plaintiff thrombolytic therapy, breached the required standard of care. This finding, however, does not necessarily absolve defendant of any liability for the extensive heart damage suffered by plaintiff. In fact, the court finds that although the actions of SGMC fell below the required standard of care, plaintiff had already suffered extensive heart damage by the time she had arrived at SGMC. That damage is directly attributable to the failure of Moody AFB to provide thrombolytic therapy. The only issue that remains is whether defendant is liable for all the heart damage plaintiff suffered, or only a portion thereof.

 Plaintiff asserts that any negligence on the part of SGMC would not operate as a superseding cause of the damage plaintiff suffered as a result of her myocardial infarction. Further, plaintiff contends that once defendant negligently injured plaintiff, defendant became liable for any subsequent acts of medical malpractice that occurred as a result of defendant's actions.

"It is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening, act of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury."

*Levangie v. Dunn,* 182 Ga.App. 439, 440, 356 S.E.2d 88, 89–90 (1987) (quoting *Union Carbide v. Holton,* 136 Ga.App. 726, 729, 222 S.E.2d 105, 108–09 (1975)); *see also Knudson v. Lenny's Inc.,* 202 Ga.App. 85, 86, 413 S.E.2d 258, 260 (1991). As the above passage indicates, the intervening act must take place between the negligent act of the defendant and the injury to the plaintiff. *See Coleman v. Atlanta Obstetrics,* 194 Ga.App. 508, 511, 390 S.E.2d 856, 858 (1990). The problem in the case *sub judice,* however, is that plaintiff had already suffered heart damage by the time she had arrived at SGMC. Under these circumstances, a fine line cannot be drawn between the negligent act of defendant and the onset of plaintiff's injury. The negligent acts of SGMC took place while plaintiff's injuries were occurring. Strictly speaking, the acts of SGMC cannot be considered a superseding cause of plaintiff's injuries. *See Coleman,* 194 Ga.App. at 511, 390 S.E.2d at 858 (recognizing that an act of negligence which merely *contributes* to an already existing injury does not break the chain of causation). Further, in order for an intervening act to break the chain of causation between the original act of negligence and the injury, the intervening act must be unrelated to the original act of negligence. *Id.* (citing *Wanless v. Winner's Corp.,* 177 Ga.App. 783, 785, 341 S.E.2d 250, 252 (1986)). An act is not unrelated when it is a step necessarily taken to rectify a situation created by the original act of negligence. *Id.* That is the situation in the case at hand.

Georgia courts have long recognized that "[a] defendant may be liable not only for all damages resulting directly from his negligent act 'but also for all damage resulting from the improper or unskillful treatment of the injuries by the physician.'" *Id.,* 194 Ga.App. at 510, 390 S.E.2d at 858 (quoting *Smith v. Hardy,* 144 Ga.App. 168, 240 S.E.2d 714 (1977)). In *Coleman,* the Georgia Court of Appeals held that the original act of negligence may be medical malpractice; that is, "the injury [is] the result of malpractice in response to malpractice...." *Id.,* 194 Ga. App. at 511, 390 S.E.2d at 858. In these situations, the original tortfeasor becomes li-

able for injuries caused by a subsequent act of malpractice.

Under the facts of the case *sub judice*, the negligent acts of SGMC do not operate to break the chain of causation between defendant's breach of the standard of care and plaintiff's injuries. Defendant, therefore, is liable for all damages plaintiff suffered as a result of defendant's failure to provide thrombolytic therapy as well as SGMC's failure to provide thrombolytic therapy.

IV. Conclusion

The court holds that defendant United States did not breach its duty of care in failing to diagnose plaintiff Debra Mac-Donald's hypothyroidism. However, the court holds that defendant's failure to diagnose plaintiff's hypercholesterolemia and heart disease, the failure of supervising physicians to properly supervise physician's assistants, and the failure to provide thrombolytic therapy, breached the required standard of care and proximately caused plaintiff's myocardial infarction and the damage suffered as result thereof. Accordingly, a date will be set for a hearing on the issue of the appropriate measure of damages.

**SO ORDERED.**