**Debra MacDONALD, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 7:92–cv–25 (WDO).**

United States District Court,
M.D. Georgia,
Valdosta Division.

Oct. 10, 1995.

Michael P. Curreri, Rodney K. Adams, Richmond, VA, Mark S. Brennan, Sr., Richmond, VA, for plaintiff.

Lillian Harris Lockary, Macon, GA, for defendant.

## *AWARD OF DAMAGES*

OWENS, District Judge.

On April 13, 1994, in this Federal Tort Claims civil action the court in its published decision, 853 F.Supp. 1430, found the negligence of defendant United States to have been the proximate cause of the injury and damage sustained by plaintiff Mrs. Debra McDonald, concluding in its order "that defendant United States did not breach its duty of care in failing to diagnose plaintiff Debra MacDonald's hypothyroidism. However, the court holds that defendant's failure to diagnose plaintiff's hypercholesterolemia and heart disease, the failure of supervising physicians to properly supervise physician's assistants, and the failure to provide thrombolytic therapy, breached the required standard of care and proximately caused plaintiff's myocardial infarction and the damage suffered as result thereof. Accordingly, a date will be set for a hearing on the issue of the appropriate measure of damages." *MacDonald*, 853 F.Supp. at 1433.

On September 13, 1994, the court held a further hearing on damages. Afterwards, the court suggested, and the plaintiff assented to, a medical examination of the plaintiff by Dr. Richard J. Nijem, the Valdosta, Geor-

gia cardiologist who cared for plaintiff after her 1989 heart attack.

Dr. Nijem, on February 16 and 17, 1995, examined Mrs. MacDonald to ascertain her current physical condition and her future prognosis, utilizing both non-invasive and invasive procedures. By letter dated February 24, 1995, Dr. Nijem submitted a superb, especially thorough report of his examination and evaluation in which he found:

> ... Debra's current physical condition to be one of a moderately disabled status. She is limited by both the previous damage from her heart attack of 1/29/89 and by progressive disease within two other major coronary arteries. With regard to her prognosis, I would recommend that Mrs. MacDonald undergo open heart surgery for bypass of her obtuse marginal artery and her right coronary artery. I see this as her only option inasmuch as she is currently on maximum medical therapy and still symptomatic. Her prognosis is very poor without open heart surgery and fair with the open heart surgery.

As ordered, the United States paid $7,351.00 for medical bills and $2,252.34 for travel costs for Dr. Nijem's evaluation for a total of $9,603.34.

Mrs. MacDonald received a copy of Dr. Nijem's report. Without consulting or advising the court or counsel, she accepted Dr. Nijem's recommendation and went to a Madison, Connecticut cardiologist who referred her to a cardiothoracic surgeon for quadruple bypass surgery which was performed on March 21, 1995.

On May 12, 1995, the court heard the arguments of counsel on damages by conference telephone call, at the conclusion of which the court directed plaintiff's counsel to "contact the MacDonalds and let me have an affidavit as to what insurance coverage is involved and what the plan is for surgery...." (Tr. p. 25). As a result counsel contacted the MacDonalds and learned for the first time of her already performed open heart surgery.

Mrs. MacDonald's cardiologist, by her June 22, 1995, affidavit, has reported that "as a result of her surgery, Mrs. MacDonald's ischemic coronary artery disease symptoms have improved. However, I do not expect that Mrs. MacDonald's left ventricular dysfunction symptoms will improve appreciably as a result of this surgery...." (Dr. Keszler's affidavit).

On July 7, 1995, the court held another hearing to observe Mrs. MacDonald's postoperative condition and hear from her as to her damages.

Counsel for the plaintiff and the defendant have submitted an abundance of evidence and law to the court and have each vigorously represented their clients. All having been carefully considered, it is now the court's responsibility to award damages.

Damages, of course, are given as compensation for injury done to plaintiff Mrs. MacDonald. The law of Georgia seeks to see that those damages are fair to both the plaintiff and the defendant, requiring the court to award such sums as the court sitting without a jury believes are reasonable and just in this case. O.C.G.A. § 51–12–4.

### MEDICAL EXPENSES

■ Mrs. MacDonald's medical expenses such as hospital, doctors and medical bills resulting from defendant's negligence are a legitimate item of damages, as are future medical expenses proximately caused by defendant's negligence. O.C.G.A. § 51–12–7. If damages for future medical expenses are awarded, the court must take into consideration that it is making a present cash award for expenses to be incurred in the future. See Johnson v. Rooks, 116 Ga.App. 394, 157 S.E.2d 527 (1967); Hagin v. Powers, 140 Ga.App. 300, 231 S.E.2d 780 (1976).

Mrs. MacDonald is the dependent wife of a former member of the United States Air Force entitled to retired pay. As such, she is entitled to use the Armed Forces Medical Treatment Facilities (MTF) for medical care; for needed services not available at an MTF Mrs. MacDonald may elect to pursue certain health benefits through CHAMPUS and the regulations pertaining thereto. 10 U.S.C. §§ 1079–1086; 32 C.F.R. §§ 199.1–16.

Current law provides that for outpatient medical care a CHAMPUS beneficiary must

meet a deductible of $150 per person or $300 per family to qualify for payments by CHAMPUS of 75% of the medical charges allowable under CHAMPUS coverage, with a 25% cost share to the beneficiary. Inpatient treatment is generally paid under a diagnostic-related group formula (DRG), which establishes a set amount CHAMPUS will pay for inpatient care related to a primary diagnosis, and the amounts paid are governed by the applicable regulations. In the event a patient or the patient's family incurs allowable medical costs of $7,500 in a given fiscal year, whether from the deductible or cost share, CHAMPUS affords a "catastrophic cap" and pays 100% of remaining reasonable and allowable medical charges for the balance of the year.

Mrs. MacDonald's retired husband is now employed, and he and she are covered by his employer's health care plan. As such, CHAMPUS operates as secondary coverage to that health care plan.

### *CHAMPUS—MOTION TO OFFSET*

■ The United States has moved the court to offset whatever payments plaintiff has received or will receive from the United States under CHAMPUS against whatever damages are awarded for past and future medical expenses. Plaintiff objects, contending that CHAMPUS payments come from a collateral source and thus under Georgia law may not be taken into consideration and/or offset against Mrs. MacDonald's past and future medical expenses.

Plaintiff relies upon *Murphy v. United States*, 836 F.Supp. 350 (E.D.Va.1992), in which the district court held that CHAMPUS is a fringe benefit earned by a service member's years of service and is thus analogous to health care benefits afforded to civilian employees; is thus partially paid for by the employee; and is, therefore, under Virginia law a collateral source not to be considered.

The United States in support of its motion relies upon *Mays v. United States*, 806 F.2d 976 (10th Cir.1986), which held that CHAMPUS payments come exclusively from the general revenues of the United States and not from a special fund to which the plaintiff or her husband contributed; as such CHAMPUS is not a collateral source.

Georgia law, of course, governs. What is a collateral source under Georgia law?

The collateral source rule is primarily substantive in nature. It gives a party the right to recover damages undiminished by collateral benefits. It refuses credit to the benefit of a tortfeasor of money or services received by the plaintiff in reparation of the injury or damage caused which emanate from sources other than the tortfeasor. R. Maxwell, *The Collateral Source Rule in the American Law of Damages*, 46 Minn.L.Rev. 669, 670 (1962). "The collateral source rule, stated simply, is that the receipt of benefits or mitigation of loss from sources other than the defendant will not operate to diminish the plaintiff's recovery of damages." R. Sedler, *The Collateral Source Rule and Personal Injury Damages: The Irrelevant Principle and the Functional Approach*, 58 Ky.L.Rev. 36, 38 (1969). Apparently the rule came into Georgia law through the opinion of Judge Samuel Lumpkin in *The Western and Atlantic Railroad v. Meigs*, 74 Ga. 857 (1885). He wrote that damages due a widow on account of the wrongful death of her husband caused by the negligence of the defendant railroad should not be reduced by the amount of life insurance proceeds she received. The rule has been applied in many decisions under varying circumstances. (*See* the collection of cases by Judge Eberhardt in *Cincinnati, New Orleans & Texas Pacific Railway Company v. Hilley*, 121 Ga.App. 196, 201, 173 S.E.2d 242 (1970)).

*Polito v. Holland*, 258 Ga. 54, 55–56, 365 S.E.2d 273, 274 (1988) (emphasis supplied) (footnote omitted).

■ The collateral source rule in Georgia thus turns on the question of whether or not the benefit emanated solely from the defendant tortfeasor. If so, it generally speaking is not a collateral source; if not, it generally speaking is a collateral source.

CHAMPUS as a matter of law is a benefit that emanates solely from the United States and to which plaintiff's husband has made no monetary contribution. For plaintiff's retir-

ee husband and plaintiff to continue to participate, plaintiff's husband is not required to make a monetary contribution. They participate in and benefit from CHAMPUS solely because he is retired from the United States Air Force and she is his dependent wife.

As the Tenth Circuit Court of Appeals stated:

> The CHAMPUS program provides medical benefits to, *inter alia*, the dependents of certain retired members of the armed services. 10 U.S.C. § 1079. "The funds used by the CHAMPUS program are appropriated funds furnished by the Congress through the annual Appropriations Act for the Department of Defense and the Department of Health, Education and Welfare [now the Department of Health and Human Services]." 32 C.F.R. § 199.7(e–1) (1985). All of the money for the CHAMPUS program comes from the general treasury of the United States; no money is paid directly into the funds by the recipients of CHAMPUS benefits. We cannot view these general appropriations to the CHAMPUS program as "a special fund that is separate and distinct from general government revenues." *Berg*, [*v. United States*, 806 F.2d 978], at 985 [ (10th Cir. 1986) ]. CHAMPUS payments come exclusively from the general revenues of the United States. Therefore, such payments are not from a source collateral to the United States.

*Mays v. United States*, 806 F.2d 976, 977 (10th Cir.1986) (footnote omitted).

With due respect for the views of the Eastern District of Virginia, service as a member of the United States Air Force in and of itself is not equivalent to the monetary contribution that Georgia law requires the employee to make for a health insurance plan—public or private—to be considered a collateral source.

The United States' motion to offset whatever CHAMPUS has paid and/or will pay for Mrs. MacDonald's medical expenses is, therefore, **GRANTED**.

## PAST MEDICAL EXPENSES

Mrs. MacDonald and her husband have submitted a claim to CHAMPUS (as secondary payor to Mr. MacDonald's primary insurer) for reasonable and necessary medical expenses not paid by Mr. MacDonald's primary insurer. Any portion of that claim that is reasonable and necessary and is not paid by CHAMPUS shall be paid by 'the United States. Within ninety (90) days plaintiff shall submit proof of same to the court and move the court to order the same paid, failing which plaintiff's claim for past medical expenses shall be deemed satisfied.

## FUTURE MEDICAL EXPENSES

As a result of her 1989 heart attack Mrs. MacDonald has now had open heart surgery and will continue to require medical and hospital care for the remainder of her life. While plaintiff's expert physicians have estimated the cost of her future medical care using a "worst case scenario" to be between a present value of $932,066 and $799,763, the court is unwilling to award such damages based upon any expert's "worst case scenario" educated guess. At the same time, the court desires to provide for the payment of plaintiff's actual future medical expenses by the defendant.

As a CHAMPUS beneficiary who is a dependent of a United States Air Force retiree, the most that Mrs. MacDonald and her husband will have to pay each year for medical expenses encompassed by CHAMPUS is $7,500 per year per family by reason of the CHAMPUS catastrophic cap. Once their CHAMPUS out-of-pocket expenses total said $7,500, CHAMPUS will begin paying 100% of the CHAMPUS maximum allowable charge for all charges incurred for all family members for the remainder of that year. Therefore, as the defendant suggests, "in the worst case scenario, should Mrs. MacDonald and/or her family reach the catastrophic cap of $7,500 for the remaining 20 years of her estimated life expectancy, the out-of-pocket expenses would total no more than $150,000." (Government's Motion for Offset). $150,000 is thus the maximum estimated out-of-pocket expense to be incurred by the plaintiff and/or her husband for her future reasonably neces-

sary medical care. To provide that amount, the defendant United States of America within sixty (60) days from and after this date, shall deposit $150,000 into the registry of this court to be invested at interest and disbursed from time to time to Mr. and/or Mrs. MacDonald by the clerk of this court to pay or reimburse Mr. and/or Mrs. MacDonald for having paid any CHAMPUS encompassed medical expense of Mrs. MacDonald. In the event the CHAMPUS program is legislatively changed or abolished, the deposited monies shall continue to be held in the registry of this court and used by the clerk to pay and/or reimburse Mr. and/or Mrs. MacDonald for out-of-pocket medical expenses related in any way to Mrs. MacDonald's coronary artery disease. Upon Mrs. MacDonald's death, all monies remaining in the registry and not needed to pay accrued unpaid expenses shall be returned to the United States of America.

The direction to deposit $150,000 into the registry of this court is not an award of damages. In effect, it is a provision for the creation of a trust fund to be used to pay for anticipated out-of-pocket future medical expenses of unknown amount, the residue to be returned to the depositor at such time as all future out-of-pocket medical expenses of Mrs. MacDonald have been paid. *See Hull v. United States,* 971 F.2d 1499, 1505 (10th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1844, 123 L.Ed.2d 469 (1993).

### PAIN AND SUFFERING—PAST, PRESENT AND FUTURE

■ As jurors are regularly instructed, there is no definite, specific rule that the law does or can lay down by which a court can figure in dollars and cents actual compensation for pain and suffering, and the law does not attempt to do so. In such a case as this, the law provides that the measure of recovery shall be governed by the enlightened conscience of an impartial judge. This does not mean a judge is authorized to just use any arbitrary figure. It simply means that wanting to do the right and fair thing between the parties, taking into consideration all the facts and circumstances, the judge should arrive at some figure which seems reasonable and fair. That is about the best that can be done.

■ Under Georgia law, pain and suffering includes mental suffering, but mental suffering is not a legal item of damages unless—as indisputably here—there has been physical suffering also. *Southern Railway Co. v. Jackson,* 146 Ga. 243, 91 S.E. 28 (1916); *Chapman v. Western Union Telegraph Co.,* 88 Ga. 763, 15 S.E. 901 (1892). Anxiety, shock and worry are examples of what might be included under mental pain and suffering, and loss of capacity to work, labor and enjoy life—separately from monetary earnings—may be considered as an item causing mental suffering. *Williams v. Vinson,* 104 Ga.App. 886, 123 S.E.2d 281 (1961); *Langran v. Hodges,* 60 Ga.App. 567, 4 S.E.2d 489 (1939).

■ Since plaintiff's pain and suffering will continue into the future, the court is to award damages for her future pain and suffering, the standard for such award also being the enlightened conscience of the judge. Since the plaintiff is receiving an award for damages not yet suffered, the judge is to take that into consideration in arriving at an amount. *Southern Railway Co. v. Bottoms,* 35 Ga.App. 804, 134 S.E. 824 (1926); *Brock v. Cato,* 75 Ga.App. 79, 82, 42 S.E.2d 174 (1947); *Williams v. Vinson,* 104 Ga.App. 886, 893, 123 S.E.2d 281 (1961); *Shore v. Ferguson,* 142 Ga. 657, 83 S.E. 518 (1914); *Everett v. Holmes,* 126 Ga.App. 208, 190 S.E.2d 568 (1972).

Having provided for the payment of all past medical expenses and having provided for $150,000 to be deposited into the registry of the court for future medical expenses, the court, in its enlightened conscience, does hereby award Mrs. Debra MacDonald $850,000 for her past, present and future pain and suffering.

Let judgment enter for the plaintiff.

SO ORDERED.