Philip E. BERG, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Third Party Plaintiff-Appellant,

Board of Regents, University of Colorado Medical Center and Dr. Robert Lattes, Third Party Defendants-Appellees.

No. 85–1969.

United States Court of Appeals, Tenth Circuit.

Dec. 5, 1986.

Nancy E. Rice, Asst. U.S. Atty. (Robert N. Miller, U.S. Atty. and Janis E. Chapman, Asst. U.S. Atty., with her on the briefs), Denver, Colo., for defendant-third party plaintiff.

Bennett S. Aisenberg, of Denver, Colo., for plaintiff-appellee.

Michael S. Porter (Robert W. Hansen, with him on the brief), of Hansen, Howe, Holmes and Porter, P.C., Denver, Colo., for third party defendants-appellees.

Before HOLLOWAY, Chief Judge, and SETH and TACHA, Circuit Judges.

TACHA, Circuit Judge.

The United States appeals from a decision of the United States District Court for the District of Colorado awarding $258,267 in damages to the plaintiff in this medical malpractice suit. The government claims that the court erred in finding that it was liable for the injuries suffered by the plaintiff, in granting summary judgment for the third-party defendants, and in holding that the collateral source doctrine applies to Medicare payments. We affirm the decision of the district court.

Phillip E. Berg, a 73–year–old retired colonel in the United States Army, was admitted to the Fitzsimmons Army Medical Center (hospital) on September 1, 1981, after complaining of dizziness. Neurosurgeons at the hospital diagnosed his condition as a brain tumor and ordered that a cerebral angiogram be performed to determine the nature of the tumor. An angiogram attempted at the hospital the next day was unsuccessful and resulted in a stroke that caused the blindness from which Berg now suffers.

A cerebral angiogram is performed to obtain pictures of the blood vessels within the brain. A radiologist begins by inserting a catheter into the femoral artery in the groin. The catheter is then guided by the radiologist through a series of vessels until it reaches the vertebral artery. At that point, x-ray contrast material (a type of dye) is injected through the catheter into one of the vessels supplying blood to the brain. Rapid sequence x-rays are then taken of the vessels in the brain. These pictures indicate whether there are any abnormalities affecting the blood vessels in the brain. This procedure has a two to five percent risk of stroke because the manipulation of the catheter sometimes results in a blood clot which cuts off circulation in the brain.

A cerebral angiogram requires precisely synchronized work by the radiologist and several angiographic technologists. The radiologist controls the movement of the catheter and informs the technologists when to inject the contrast material and when to take the x-rays. The technologists operate several pieces of equipment that inject the contrast material, take the x-rays and coordinate the timing of the injections and the photography. The radiologist decides when the procedure should be attempted. The radiologist, however, is not generally familiar with the highly sophisticated equipment operated by the technologists.

Dr. Robert Lattes was the radiologist who performed the cerebral angiogram on Berg. Dr. Lattes was a faculty member of the University of Colorado Medical Center, which had an agreement with the hospital to provide radiologists for angiographic procedures. The hospital provided the equipment and employed the technologists necessary to perform angiograms. Dr. Lattes had performed hundreds of cerebral angiograms. He had worked at the hospital for two years prior to September 1981.

The hospital had two rooms that could be used for cerebral angiograms. The primary room contained equipment designed specifically for angiographic procedures. This room, however, had been taken temporarily out of service by the hospital and was not available during the first week of September 1981. The back-up room had somewhat different equipment than the primary room and was not used exclusively for angiograms. One of the differences was that the machines controlling the timing of the injection of the contrast material and the shooting of the x-rays were controlled by a dial system in the primary room, but they were controlled by key punch cards in the back-up room. The hospital technologists were not as familiar with the equipment in the back-up room as they were with the equipment in the primary room. The only instruction manual for some of the equipment in the back-up room was not written in English. There had been problems with the equipment in the back-up room during the months preceding September 1981. Dr. Lattes informed the technologists of these problems so they could inform the hospital administration or the equipment manufacturer, but

there is no record that any maintenance was done on the equipment during the months before the procedure that was performed on Berg.

Berg's procedure was scheduled to be performed in the back-up room on the morning of September 2, 1981. Dr. Lattes asked the technologists about the equipment before he began the procedure, and they assured him that the equipment was functioning properly despite some initial problems they had experienced during test runs. Dr. Lattes then inserted the catheter into Berg and positioned it for the x-rays. At this point the memories of those present at the time are unclear. Their recollections as presented at trial, however, are not inconsistent. It is agreed that the equipment operated by the technologists failed on at least three separate occasions while the catheter was in place. On one occasion the injector failed to inject the contrast material. At another point the film jammed. Contrast material was injected during one other attempt but the film changer did not work. After each failure, it was necessary for Dr. Lattes to withdraw the catheter from the vertebral artery to the subclavian artery or to the aorta. The technologists then assured Dr. Lattes that the equipment problems had been resolved and Dr. Lattes decided to reinsert the catheter into the vertebral artery for another attempt to obtain the pictures. On the third or fourth attempt Berg suffered a stroke that rendered him blind.

Berg filed this suit against the United States under the Federal Tort Claims Act (FTCA)[1] alleging that the negligence of the hospital and its technologists caused his stroke and resulting blindness. The government sought contribution and indemnification from Dr. Lattes and the University of Colorado Medical Center. The district court joined these third-party defendants but then granted their motions for summary judgment before trial. A bench trial resulted in a judgment for Berg against the hospital.

## I.

The government claims that the court erred in finding that it was liable for Berg's injuries. The government argues that the acts of Dr. Lattes, not the acts of the hospital, caused the injuries suffered by Berg.

## A.

The district court held that the negligence of the hospital was the cause of the injuries suffered by Berg. The government does not challenge on appeal the determination that the hospital was negligent. Rather, the government argues that the evidence presented at trial failed to demonstrate that the actions of the hospital were the proximate cause of Berg's injuries. Colorado law provides that a negligent party is liable for his or her negligence only if that negligence was the proximate cause of the plaintiff's injury. *City of Aurora v. Loveless*, 639 P.2d 1061, 1063 (Colo.1981) (en banc); *Moore v. Standard Paint & Glass Co.*, 145 Colo. 151, 156, 358 P.2d 33, 36 (1960) (en banc). Proximate cause is a factual question in Colorado unless the facts are undisputed and reasonable minds can draw only one conclusion from them. *Sharp v. Kaiser Found. Health Plan*, 710 P.2d 1153, 1155 (Colo.Ct. App.1985) (cert. granted Dec. 9, 1985). An act is the proximate cause of an injury if there would have been no injury but for the act and if the act was a substantial factor in bringing about the injury. *Moore*, 145 Colo. at 156, 358 P.2d at 33; *see also* Colo. Jury Instructions 2d—Civ. 9:26 (defines "cause" as "that failure to act which in natural and probable sequence produced the claimed injury. It is a cause without which the claimed injury would not have been incurred.") "Substantial factor" was recently defined as conduct "of sufficient significance in producing the harm as to lead reasonable persons to regard it as a cause and to attach responsibility." *Sharp*, 710 P.2d at 1155. *See generally In*

---

1. Under the FTCA, liability is determined according to the law of the state in which the wrongful act occurred. 28 U.S.C. §§ 1346(b), 2674.

re Swine Flu Immunization Prod. Liab. Litig., 495 F.Supp. 1188, 1206 (D.Colo.1980) (summarizing the Colorado standard for proximate cause).

■ Under the definition of proximate cause used in Colorado, the evidence in this case supports the district court's conclusion that the negligence of the hospital was the proximate cause of Berg's injuries. The testimony presented at trial showed that Berg did not suffer a stroke until the third or fourth attempt to take the x-rays. A third or fourth attempt to take the pictures would have been unnecessary if the pictures had been taken during the first insertion of the catheter into the vertebral artery, or even if the second attempt had successfully produced the desired pictures. No pictures were taken during the first insertion or subsequent insertions of the catheter because the equipment operated by the technologists malfunctioned. The record shows that the equipment did not work properly because the hospital failed to maintain the equipment and the technologists were not adequately familiar with the equipment in the back-up room. Therefore, the evidence supports the district court's conclusion that it was the negligence of the hospital and the negligence of the technologists employed by the hospital that caused the first two or three attempts to fail and ultimately led to the consequences of the unsuccessful final attempt.[2]

■ The government argues that even if the hospital acted negligently, Dr. Lattes acted negligently as well in deciding to proceed after each equipment failure. There can be several proximate causes of the same injury, Reaves v. Horton, 33 Colo. App. 186, 194, 518 P.2d 1380, 1385 (1973), rev'd in part on other grounds, 186 Colo. 149, 526 P.2d 304 (1974) (en banc); accord In re Swine Flu Immunization Prod. Liab. Litig., 495 F.Supp. at 1206, and thus any negligence by Dr. Lattes could be an intervening cause breaking the chain of the hospital's negligence or a concurring cause making the hospital and Dr. Lattes joint tortfeasors.

■ The district court found that Dr. Lattes' decision to continue to attempt to get the desired pictures was a reasonable response to the representations made by the technologists that the equipment would function properly. Our review of the testimony of the expert witnesses called by both parties, the testimony of Dr. Lattes, and the testimony of the hospital employees convinces us that the district court's finding that Dr. Lattes did not act negligently is amply supported by the record and is not clearly erroneous. There was testimony that it was not unreasonable for a radiologist to proceed with several attempts to get the x-ray pictures. There was also testimony that the technologists should have informed Dr. Lattes if they were concerned that more problems would be experienced with the equipment. We agree with the district court that Dr. Lattes acted reasonably given the circum-

---

**2.** The position of the government with respect to proximate cause appears to be this: since a cerebral angiogram procedure is difficult and sometimes results in three or four separate attempts to get a picture, the negligence of the hospital cannot be said to be the "but for" cause of the stroke because other events might have led to three or four attempts to get a picture. The burden on Berg, as the government sees it, is to show that there would not have been three or four attempts even if all of the equipment worked properly. But the facts in Moore, the case on which the government relies as establishing the "but for" test, show why this position cannot be correct. In Moore, the basement of a building flooded after water from a storm collected in an adjacent parking lot that was below the level of the street. 145 Colo. at 153, 358

P.2d at 35. The owner of the building sued the owner of the parking lot, claiming that the negligent design of the parking lot caused the basement of the building to be flooded. According to the government's view of causation in the present case, the owner of the building in Moore would have had to prove that, no matter how great the storm and regardless of other unlikely but possible occurrences, the basement would not have been flooded even if the parking lot had been properly designed. The court in Moore, however, held that the negligence of the parking lot owner caused the flooding in the basement of the building. The building owner met his burden by showing that "defendants' negligence was a substantial factor in bringing about plaintiffs' damage." 145 Colo. at 157, 358 P.2d at 36.

stances under which he was operating. We therefore affirm the holding of the district court that the negligence of the hospital and the technologists was the sole proximate cause of the injuries to Berg.

### B.

The government claims that the "captain of the ship" doctrine makes Dr. Lattes liable for the negligence of the hospital and the technologists. "The 'captain of the ship' rule, which is grounded in *respondeat superior,* has been applied in Colorado to impose liability on a surgeon for the negligence of the hospital employees under his control and supervision during surgery." *Adams v. Leidholt,* 195 Colo. 450, 453, 579 P.2d 618, 620 (1978) (en banc) (citing *Beadles v. Metayka,* 135 Colo. 366, 370–71, 311 P.2d 711, 713–14 (1957) (en banc)).

Colorado's application of the "captain of the ship" doctrine emphasizes the importance of the point in time at which the doctor assumes control of the operating room. In *Young v. Carpenter,* 694 P.2d 861, 863 (Colo.Ct.App.1984), the court stated that "a crucial determination in establishing the applicability of the [captain of the ship] doctrine is the time when the surgeon assumes supervision and direction in the operating room." The hospital and the doctor cannot be simultaneously liable for the negligence of a hospital employee. *Kitto v. Gilbert,* 39 Colo.App. 374, 382, 570 P.2d 544, 550 (1977). "Hence, a factual question is presented as to whether the operating surgeon had assumed such control, at the time of the alleged negligent act, that the surgeon's responsibility supersedes that of the hospital." *Id.* at 382–83, 570 P.2d at 550; *see also Young,* 694 P.2d at 863.

The district court here found that the negligence of the hospital occurred *before* Dr. Lattes entered the operating room to treat Berg. In particular, the district court found that Berg was injured because of:

[A] combination of a lack of adequate preparation of Room 12 [the back-up room], a lack of a record of reliable use of that room for cerebral angiography, a lack of adequate maintenance of the equipment, a lack of adequate testing of the equipment, a lack of adequate training of technicians [technologists] in the context of Room 12, and a lack of adequate performance of those technicians during the subject procedure.

The failure to prepare the back-up room, the failure to maintain the equipment, and the failure to train the technologists clearly occurred before Dr. Lattes was in control of the operating room. The record also indicates that the "lack of adequate performance" by the technologists during the procedure performed on Berg was the result of the negligence of the hospital occurring before Dr. Lattes was in control of the operating room. The technologists experienced difficulty during Berg's unsuccessful angiogram because they had not been properly trained by the hospital to use the equipment in the back-up room. Accordingly, the "lack of adequate performance" of the technologists is attributable to the hospital, not Dr. Lattes. The findings of the district court are well supported by the record and are not clearly erroneous. The "captain of the ship" doctrine, therefore, does not make Dr. Lattes liable for the negligence of the hospital because the negligent acts of the hospital occurred before Dr. Lattes was in control of the operating room.[3]

---

**3.** There was testimony at trial that the duties of a radiologist and the duties of the technologists during a cerebral angiogram are not substantially related, and that a radiologist is not in a position to question the assurances given him by the technologists. Several courts have created an exception to the "captain of the ship" doctrine in instances where the doctor does not exercise effective control over the hospital employees. In *Weeks v. Latter-Day Saints Hosp.,* 418 F.2d 1035, 1038 (10th Cir.1969), the district court directed a verdict against the hospital where the malfunction of hospital equipment during surgery caused the injury. The hospital attempted to shift the burden of responsibility for the malfunction to the physicians. This court upheld the directed verdict because there was no evidence presented indicating that an anesthesiologist is capable of detecting malfunctions in equipment supplied by the hospital.

## II.

The government sought to pursue contribution and indemnification claims against Dr. Lattes and his employer, the University of Colorado Medical Center. The district court granted summary judgment before trial for these third-party defendants. We have rejected the government's claims that the negligence of Dr. Lattes caused the injuries to Berg and that the negligence of the technologists is attributable to Dr. Lattes. These holdings make it unnecessary to decide whether the district court properly granted summary judgment for the third-party defendants on other grounds. Although Dr. Lattes was not a party at the trial, the claim that he had acted negligently in treating Berg was fully litigated because the government argued that the negligence of Dr. Lattes was the cause or an intervening cause of the injuries suffered by Berg. It was necessary for the district court to determine whether Dr. Lattes was negligent in order to resolve the government's defenses. Our affirmance of the district court's conclusion that Dr. Lattes is not responsible for the injuries to Berg makes the contribution and indemnification claims moot. *See Miller v. New York Produce Exch.*, 550 F.2d 762, 769 (2d Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977) (a challenge to a district court order dismissing a claim against a corporation for the actions of its employees is moot after a verdict is delivered in favor of the employees). We therefore need not consider the propriety of the pretrial order granting summary judgment to Dr. Lattes and the University of Colorado Medical Center.

## III.

Berg's medical expenses were paid in large part by Medicare. The government claims that the amount of Medicare assistance that Berg received should be deducted from his FTCA award. Berg argues that Medicare is a collateral source and that no deduction is permitted.

Colorado law provides that "compensation or indemnity received by an injured party from a collateral source, wholly independent of the wrongdoer and to which he has not contributed, will not diminish the damages otherwise recoverable from the wrongdoer." *Kistler v. Halsey*, 173 Colo. 540, 545, 481 P.2d 722, 724 (1971) *quoted in Steckler v. United States*, 549 F.2d 1372, 1379 (10th Cir.1977). A collateral source, then, is one which is distinct from the funds of the defendant. In the context of a FTCA suit, an injured party who has already been compensated for his or her injuries can also recover damages from the United States unless the source of the original compensation was funds provided by the United States.

We considered the collateral source rule as applied to a FTCA action most recently in *Steckler*. 549 F.2d at 1378–79. The injured party in *Steckler* had been compensated by veterans benefits and Social Security disability benefits. The government argued that those payments should be subtracted from any FTCA award. We held that the veterans benefits were not a collateral source and could therefore be deducted from the FTCA award.[4] The court then said that the Social

---

Similarly, the Supreme Court of Oregon in *May v. Broun*, 261 Or. 28, 39–40, 492 P.2d 776, 781–82 (1972) held that, where injury is caused by malfunctioning equipment or negligent operators, a doctor is not responsible for highly technical equipment and the hospital technicians who operate it absent evidence that the doctor had the ability to supervise or directly control the machine or its operator. The Colorado courts, however, have not yet recognized such an exception to the "captain of the ship" doctrine. We decline, therefore, to adopt this rule for Colorado. We rely instead on the findings of the district court that the negligent acts of the

hospital occurred before Dr. Lattes was in control of the operating room.

4. This court was the first federal court to consider the application of the collateral source rule in a FTCA action. *United States v. Gray*, 199 F.2d 239 (10th Cir.1952). In *Gray*, this court held that an award under the FTCA should be offset by the veteran's disability payments received by the plaintiff, but that an award should not be offset by hospitalization benefits. 199 F.2d at 244. We reached this result by analyzing the legislative history of the FTCA and distinguishing between the purposes

Security disability benefits were logically collateral. *Steckler,* 549 F.2d at 1379. The test that we applied to determine whether a particular payment was collateral or not focused on whether the injured party had contributed to the fund from which he or she was now collecting. *Id. See also Siverson v. United States,* 710 F.2d 557, 560 (9th Cir.1983) ("Courts distinguish between those benefits that come from unfunded general revenues of the United States (deductible) and those that come from 'a special fund supplied *in part* by the beneficiary or a relative upon whom the beneficiary is dependent' (nondeductible).") (emphasis in original) (quoting *United States v. Harue Hayashi,* 282 F.2d 599, 603 (9th Cir.1960). In *Steckler,* however, we hoped to gain more detailed information concerning the "part or percentage" of the Social Security fund attributable to the government and the "part or percentage" attributable to the injured party. 549 F.2d at 1379. We remanded to the district court to obtain this information, but we recognized that "[i]t may be impossible to ascertain the part or percentage of funds attributable to the government which would be deductible since the monies are commingled." *Id.* We are now convinced that it is in fact impossible to distinguish accurately which part of a fund that has been produced by millions of contributors is attributable to the government and which part is attributable to a particular injured party. Therefore, we require that the plaintiff bear the burden of showing only that he or she contributed to a special fund that is separate and distinct from general government revenues. *See Siverson,* 710 F.2d at 560. *See also Titchnell v. United States,* 681 F.2d 165, 176 (3d Cir.1982); *Overton v. United States,* 619 F.2d 1299, 1309 (8th Cir.1980). Berg testified at trial that he had contributed to the Social Security fund

since its creation and was therefore eligible for Medicare benefits. The government does not challenge this assertion.

We must now decide whether Medicare benefits are paid from a special fund that is separate and distinct from general government revenues. The Social Security Act provides Medicare hospital insurance benefits to, *inter alia,* those who are age 65 or over and are eligible for Social Security retirement benefits. 42 U.S.C. § 1395c. Medicare hospital insurance benefits are paid from the Federal Hospital Insurance Trust Fund. 42 U.S.C. § 1395i. This fund is supplied in great part by the taxes imposed on employees and employers by the Federal Insurance Contributions Act (FICA), 26 U.S.C. § 3101(b), taxes more commonly known as Social Security taxes.

In *Steckler,* we said that Social Security disability benefits are logically collateral. 549 F.2d at 1379. The Medicare benefits received by Berg in this case were funded by the same employment tax scheme that funded the Social Security disability benefits in *Steckler. Compare* 26 U.S.C. § 3101(a) (rate of tax for disability insurance) *with* 26 U.S.C. § 3101(b) (rate of tax for hospital insurance). The nature of an employee's tax contribution is the same in both instances.

Further support for the conclusion that Medicare benefits are a collateral source is provided by the decisions of the other courts that have considered the issue. They have each concluded that when a plaintiff has paid Social Security taxes while employed, any Medicare benefits that are subsequently received are a collateral source. *Siverson,* 710 F.2d at 560; *Titchnell,* 681 F.2d at 176. *See also Overton,* 619 F.2d at 1309 (Part A Medicare benefits were not a collateral source only because the plaintiff did not contribute to the Social

---

of the two payments. *Id.* No consideration was given to the *source* of the payments other than the implicit understanding that the source was the United States government. Thus, the *Gray* court did not consider whether the payments were derived from a source to which the plaintiff had contributed. Subsequent decisions of this circuit and other circuits have focused on

the source of the payments received by the plaintiff. *See, e.g., Steckler,* 549 F.2d at 1379; *Siverson v. United States,* 710 F.2d 557, 560 (9th Cir.1983); *Titchnell v. United States,* 681 F.2d 165, 174–76 (3d Cir.1982); *Overton v. United States,* 619 F.2d 1299, 1305–09 (8th Cir.1980). Accordingly, we focus on the source of the benefits in this case.

986

Security fund). We therefore hold that the district court properly characterized the Medicare benefits received by Berg as a collateral source.

## IV.

Berg has requested an award of double costs pursuant to Federal Rule of Appellate Procedure 38. According to Rule 38, a court of appeals may award damages and single or double costs to the appellee if it determines that an appeal is frivolous. We find that the issues raised in this appeal are far from the type of frivolous claims that would justify a Rule 38 award. The request for double costs is therefore denied.

The judgment of the district court is AFFIRMED.

