(Slip Opinion)

# The Equal Employment Opportunity Commission's Use of the Collateral Source Rule in Federal Sector Discrimination Cases

When the Equal Employment Opportunity Commission awards past pecuniary damages against a federal agency pursuant to 42 U.S.C. § 2000e-16(b), it may apply the collateral source rule to decline to deduct insurance benefits that a claimant received through the Federal Employees Health Benefits program.

August 12, 2024

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
DEPARTMENT OF AGRICULTURE

This dispute concerns whether the Equal Employment Opportunity Commission ("EEOC") may award past pecuniary damages against federal agencies pursuant to the "collateral source rule." That longstanding common law rule measures damages without regard to payments or benefits a plaintiff receives from an independent (i.e., collateral) source. Plaintiffs thus can recover their full damages even when insurance or other payments might cover some or all of those damages—though insurers may in turn have rights to these recoveries.

The Department of Agriculture ("USDA") brought this dispute to our Office after the EEOC Office of Federal Operations ("OFO") applied the collateral source rule in a Rehabilitation Act case involving the USDA. *Tien E.*, EEOC DOC 2020001343, 2021 WL 3419376 (July 15, 2021). OFO found that USDA had unlawfully denied an employee a reasonable accommodation and determined that the employee could fully recover her provable medical expenses without regard to whether those expenses had been paid by her insurance under the Federal Employees Health Benefits ("FEHB") program. *Id.* at *3–6. When USDA sought reconsideration, arguing that OFO could not lawfully apply the collateral source rule, EEOC declined the request on the ground that USDA had not previously raised the argument. *Tien E.*, EEOC DOC 2021004572, 2023 WL 3040327, at *5 (Apr. 11, 2023). EEOC noted, however, that in prior cases it had "held that a federal Agency is required to pay a Complainant's medical bills" without regard to health insurance coverage. *Id.* at *5 n.3.

USDA now seeks our views on whether EEOC may apply the collateral source rule to decline to deduct, from a claimant's past pecuniary damag-

es award, FEHB health insurance benefits. USDA argues that such awards fall outside the scope of what Congress authorized EEOC to require federal agencies to pay and that the awards also conflict with EEOC's own guidance. Memorandum for Zachary C. Schauf, Deputy Assistant Attorney General, Office of Legal Counsel, from Janie Hipp, General Counsel, USDA, *Re: Request for Opinion on the EEOC's Use of the Collateral Source Rule in Federal Sector Discrimination Cases* (June 2, 2023) ("June 2 USDA Memo"). For the reasons that follow, we disagree.[1]

## I.

### A.

Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on race, color, religion, sex, and national origin. *See* Pub. L. No. 88-352, § 703, 78 Stat. 241, 255–57 (codified as amended at 42 U.S.C. § 2000e-2). In 1972, Congress extended Title VII to cover employment in the federal government. *See* Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, sec. 11, § 717, 86 Stat. 103, 111–12 (codified as amended at 42 U.S.C. § 2000e-16). That extension gave EEOC authority to enforce Title VII against the federal government "through appropriate remedies, including reinstatement or hiring of employees with or without back pay." 42 U.S.C. § 2000e-16(b). The Rehabilitation Act of 1973 forbids employment discrimination by federal agencies on the basis of disability and incorporates Title VII's remedies. *See* Pub. L. No. 93-112, § 501, 87 Stat. 355, 390–91 (codified as amended at 29 U.S.C. § 791); 29 U.S.C. § 794a(a)(1).

---

[1] USDA has not sought our views on EEOC's decision to reject USDA's collateral source argument on procedural grounds, *see Tien E.*, 2023 WL 3040327, at *5, and we do not address that issue. Rather, consistent with USDA's request, we address solely the more general question concerning EEOC's substantive authority to award the type of damages at issue here—the sort of "dispute between two executive agencies on a question of law" our Office typically resolves. *Authority of the Equal Employment Opportunity Commission to Impose Monetary Sanctions Against Federal Agencies for Failure to Comply with Orders Issued by EEOC Administrative Judges,* 27 Op. O.L.C. 24, 26–27 (2003); *see, e.g.*, *id.* (considering whether EEOC exceeded its statutory authority in imposing particular monetary sanctions). In addressing that question, we received views from the Merit Systems Protection Board, the Civil Rights Division, and the Federal Programs Branch of the Civil Division, in addition to USDA and EEOC.

In the Civil Rights Act of 1991, Congress for the first time permitted victims of intentional employment discrimination under Title VII and the Rehabilitation Act to recover "compensatory and punitive damages." *See* Civil Rights Act of 1991, Pub. L. No. 102-166, § 102, 105 Stat. 1071, 1072 (codified at 42 U.S.C. § 1981a(a)(1)–(2)). Congress, however, precluded awards of "punitive damages" against "a government, government agency or political subdivision." *Id.* § 1981a(b)(1). Moreover, although section 1981a by its terms concerns actions in court, the Supreme Court in *West v. Gibson*, 527 U.S. 212 (1999), held that this provision also renders compensatory damages an "appropriate remed[y]" that EEOC may award in administrative proceedings, *id.* at 217 (quoting 42 U.S.C. § 2000e-16(b)).

Congress authorized these damages to reinforce the "twin statutory objectives" that Title VII pursued from the start—deterring employers from discriminating and compensating employees who faced discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417, 421 (1975). On the one hand, such damages "raise the cost of . . . intentional discrimination, thereby providing employers with additional incentives to prevent" it. H.R. Rep. No. 102-40 pt. 1, at 65 (1991) (emphasis omitted); *see* Civil Rights Act of 1991 § 2, 42 U.S.C. § 1981 note (finding that "additional remedies under Federal law are needed to deter . . . intentional discrimination in the workplace"). On the other, such damages "are necessary to make . . . victims whole for the terrible injury to their careers, to their mental and emotional health, and to their self-respect and dignity." H.R. Rep. No. 102-40, at 64–65; *see* Civil Rights Act of 1991 § 3, 42 U.S.C. § 1981 note (explaining that one purpose of the 1991 Act was "to provide appropriate remedies for intentional discrimination . . . in the workplace").

## B.

The collateral source rule addresses a longstanding damages problem: how to treat injury-related payments "from sources that have nothing to do with the defendant," such as the "plaintiff's own insurance, job benefits, or donations by friends." 3 Dan B. Dobbs et al., *The Law of Torts* § 482 (2d ed. 2011). The "traditional rule" is that payments from such "collateral sources" are "none of the defendant's business," *id.*, and "do not have the effect of reducing the recovery against the defendant," *Restatement (Second) of Torts* § 920A cmt. b (Am. L. Inst. 1979); *accord*

*Collateral Source Rule*, Black's Law Dictionary 262 (6th ed. 1990) ("[I]f an injured person receives compensation for his injuries from a source wholly independent of the tort-feasor, the payment should not be deducted from . . . damages[.]"); *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 65 (D.C. Cir. 2019) (similar).

In the United States, courts have recognized the collateral source rule since at least *The Propeller Monticello v. Mollison*, 58 U.S. 152 (1855). There, the defendant (a steamship) argued that the plaintiff (a schooner that the steamship had rammed) could not recover because, thanks to insurance, it had already been fully compensated. *Id.* at 155. The Court rejected that argument based on a doctrine that, even in 1855, it regarded as "well established at common law"—that "the trespasser has no concern" with the plaintiff's "contract with the insurer." *Id.* A few years later, the Supreme Court of Vermont canvassed the common law authorities and reached the same conclusion: A plaintiff's "policy of insurance" was "collateral to the remedy against the defendant" and thus "money received by the plaintiff" from this policy should not "operate as a defense." *Harding v. Town of Townshend*, 43 Vt. 536, 538 (1870). Since then, the rule has been "well-settled and reasonably uniform across the country, at least in its broad outlines," absent modification by statute. *Restatement (Third) of Torts: Remedies* § 10 cmt. b (Am. L. Inst., Tentative Draft No. 2, 2023); *accord* Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies* § 3.2 (3d ed. 2018) (explaining that "[t]he traditional collateral source rule is that these collateral benefits do not affect the measurement of plaintiff's damages," and that absent statutory modification, "the rule remains in good standing"). Hence, under the "common law," "it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives." *Restatement (Second) of Torts* § 920A cmts. b, d.

The collateral-source rule has been justified as avoiding "windfall[s] for the tortfeasor" and as preserving the benefit of the bargain between the plaintiff and the third-party payor. *Id.* cmt. b. These same bargains, moreover, will often eliminate the double compensation that the doctrine on its face may be seen to permit. "Insurance proceeds are the most common collateral source," *Collateral Source Rule*, Black's Law Dictionary 330 (11th ed. 2019), and insurers are often entitled to reimbursement from the tort victim's judgment or to subrogation of the victim's claims, *Restate-*

ment (Third) of Torts: Remedies § 10 cmt. b; *see US Airways, Inc. v. McCutchen*, 569 U.S. 88, 96–97 (2013).

In particular, a reimbursement provision "requires an insured employee who receives payment from another source (e.g., the proceeds yielded by a tort claim) to return healthcare costs earlier paid out by the carrier." *Coventry Health Care of Missouri, Inc. v. Nevils*, 137 S. Ct. 1190, 1194 (2017). A subrogation provision results in the "transfer of the right to a third-party payment from the insured employee to the carrier, who can then pursue the claim against the third party." *Id.* Although reimbursement and subrogation differ, the terms are often used interchangeably to describe insurers' ability to seek repayment from the insured or third parties. Here, EEOC and USDA agree that all FEHB insurers have reimbursement and subrogation rights. *See* Letter for Zachary C. Schauf, Deputy Assistant Attorney General, Office of Legal Counsel, from Carol R. Miaskoff, Legal Counsel, EEOC at 12–13 (Aug. 9, 2023) ("EEOC Memo") (setting forth relevant subrogation and reimbursement provisions); Memorandum for Zachary C. Schauf, Deputy Assistant Attorney General, Office of Legal Counsel, from Janie Hipp, General Counsel, USDA at 3 n.4 (July 28, 2023) ("July 28 USDA Memo") (acknowledging subrogation rights).

## C.

For nearly 30 years, since shortly after Congress authorized EEOC to award compensatory damages under Title VII, EEOC has applied the collateral source rule to such awards. *See Margaret L.*, EEOC DOC 0120150582, 2018 WL 2017627, at *6 (Apr. 17, 2018); *Robert E. Wallis*, EEOC DOC 01950510, 1995 WL 869201, at *12–13 (Nov. 13, 1995). In *Wallis*, where EEOC first explained its decision to do so, the Commission relied on a treatise on remedies that cited common law sources, federal judicial decisions under the Jones Act and the Federal Tort Claims Act ("FTCA"), and EEOC's own decisions applying the rule to hold that unemployment benefits could not be used to offset back pay (despite those benefits resulting from the defendant agency having paid an insurance premium). *Wallis*, 1995 WL 869201, at *12–13 (citing Dan B. Dobbs, *Law of Remedies* § 3.8(1) (2d ed. 1993); *Berg v. United States*, 806 F.2d 978 (10th Cir. 1986); *Scott Dana*, EEOC Appeal No. 01921641 (June 11, 1993); *Sylvia Collick-Brown*, EEOC Appeal No. 01910904

(Mar. 26, 1991)). The Merit Systems Protection Board, which decides some employment discrimination cases, has also recognized the collateral source rule for decades. *See, e.g.*, *Reid v. U.S. Postal Serv.*, 80 M.S.P.R. 405, 407 (1998).

## II.

Because this dispute concerns EEOC's authority to award monetary relief against the government, it implicates the distinctive principles that govern waivers of sovereign immunity. Such waivers "must be unequivocally expressed in statutory text." *Lane v. Pena*, 518 U.S. 187, 192 (1996); *see Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 144 S. Ct. 457, 466, (2024). "Ambiguity exists," and Congress has not legislated with the clarity required, "if there is a plausible interpretation . . . that would not authorize money damages against the Government." *FAA v. Cooper*, 566 U.S. 284, 290–91 (2012). Moreover, even where Congress has expressly waived immunity as to some types of damages, the same principles govern questions about "the *scope* of th[e] waiver." *Id.* at 291. The "scope of Congress' waiver" thus must be "clearly discernable from the statutory text in light of traditional interpretive tools" and, if it is not, the statute receives "the interpretation most favorable to the Government." *Id.* The same principles also apply to agency adjudications, including "whether an agency can itself grant a particular form of relief." *EEOC Authority to Order Federal Agency to Pay for Breach of Settlement Agreement*, 38 Op. O.L.C. 22, 27 (2014); *see Authority of the Equal Employment Opportunity Commission to Impose Monetary Sanctions Against Federal Agencies for Failure to Comply with Orders Issued by EEOC Administrative Judges,* 27 Op. O.L.C. 24, 27–28 (2003) (citing *Authority of USDA to Award Monetary Relief for Discrimination*, 18 Op. O.L.C. 52 (1994)).

This "clear statement rule," however, is not a "magic words" requirement. *Kirtz*, 144 S. Ct. at 466; *see Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 143 S. Ct. 1689, 1695 (2023); *Cooper*, 566 U.S. at 291. Hence, "[a]lthough this canon . . . requires an unmistakable statutory expression of congressional intent," "Congress need not state its intent in any particular way." *Cooper*, 566 U.S. at 291; *see Richlin Security Service Co. v. Chertoff*, 553 U.S. 571, 589 (2008). The "question is simply whether, upon applying 'traditional' tools of statutory interpre-

tation, Congress's" waiver is "'clearly discernable.'" *Lac du Flambeau Band*, 143 S. Ct. at 1696 (citation omitted).

Here, Congress has expressly authorized EEOC to order against federal agencies "appropriate remedies . . . as will effectuate the policies of" the relevant anti-discrimination statutes. 42 U.S.C. § 2000e-16(b). And *West* holds that this waiver unambiguously permits EEOC to award the money damages Congress has authorized under section 1981a. 527 U.S. at 217. Section 1981a, in turn, authorizes "compensatory . . . damages" but not "punitive damages" against government defendants. 42 U.S.C. § 1981a(a)(1), (b)(1). This dispute thus turns on whether past pecuniary damages awards that, in accordance with the collateral source rule, decline to deduct FEHB benefits unequivocally qualify as the former and not the latter. EEOC argues that longstanding precedent demonstrates that damages "assessed pursuant to the collateral source rule" are not "punitive damages" but rather "a form" of "compensatory damages." EEOC Memo at 4. USDA claims the opposite, focusing on one key fact: The rule allows complainants with FEHB health insurance to recover costs they "did not pay . . . out of [their own] pocket." June 2 USDA Memo at 5. That fact, per USDA, pushes such awards "beyond make-whole relief" that qualifies as compensatory, July 28 USDA Memo at 4, and renders them "punitive," June 2 USDA Memo at 5; July 28 USDA Memo at 2 & n.1. For the reasons that follow, we agree with EEOC.

## A.

We start with the Supreme Court's decision concerning the FTCA in *Molzof v. United States*, 502 U.S. 301 (1992)—which both forecloses USDA's argument that applying the collateral source rule turns a damages award into "punitive damages" and provides a blueprint for assessing whether such an award qualifies as "compensatory damages." The FTCA, like section 1981a, waives sovereign immunity but excludes "punitive damages." 28 U.S.C. § 2674. And like USDA, the government in *Molzof* argued that this carve-out excluded "any damages other than those awarded for a plaintiff's *actual* loss," including damages the government deemed "excessive" or "duplicative." *Molzof*, 502 U.S. at 306. Such damages, the government said, were "punitive *in effect*" and so constituted "punitive damages." *Id.*

Unanimously, the Court disagreed. The Court explained that the FTCA "prohibits awards of 'punitive damages,' not 'damages awards that may have a punitive effect.'" *Id.* And the Court emphasized that "punitive damages" is "a legal term of art that has a widely accepted common-law meaning." *Id.* Punitive damages are "awarded to punish defendants for torts committed with fraud, actual malice, violence, or oppression," based "upon the degree of the defendant's culpability" and with the amount tied to "the nature of the defendant's conduct." *Id.* at 307 (quotation marks omitted). The Court therefore applied the "cardinal rule of statutory construction" that when "'Congress borrows terms of art'" with such deep roots, Congress "'presumably knows and adopts'" the "'widely accepted definitions.'" *Id.* (quoting *Morissette v. United States,* 342 U.S. 246, 263 (1952)). Because the *Molzof* award did "not depend upon any proof that the defendant . . . engaged in intentional or egregious misconduct," and its "purpose [wa]s not to punish," it did not constitute "punitive damages" under "traditional common-law principles." *Id.* at 312.

So too here. We see no basis for interpreting "punitive damages" differently in section 1981a than in the FTCA. Instead, we apply the same traditional common law definition of punitive damages that *Molzof* embraced. And under that definition, EEOC awards calculated in accordance with the collateral source rule are not "punitive damages." Such awards are not based on the defendant's malice or a finding that its conduct merited punishment. *See, e.g.*, *Helfend v. S. Cal. Rapid Transit Dist.*, 465 P.2d 61, 69 (Cal. 1970) (rejecting argument that such damages are punitive and noting that "if the collateral source rule were actually punitive, it could apply only in cases of oppression, fraud, or malice"). Rather, they are pegged to "the harm suffered because of the agency's discriminatory action," proved "through appropriate evidence." *Tien E.*, 2021 WL 3419376, at *4.

## B.

*Molzof* does not resolve whether awards calculated via the collateral source rule constitute "compensatory damages." The FTCA bars punitive damages from being awarded against the federal government, but otherwise, the government's liability "is generally determined by reference to state law." *Molzof*, 502 U.S. at 305. *Molzof* thus had no occasion to consider, and indeed expressly reserved judgment on, a hypothetical statute

providing "that the United States 'shall be liable only for compensatory damages.'" *Id.* at 307–08. But when we apply *Molzof*'s methodology to this question, it demonstrates why EEOC's position is correct.

### 1.

Although section 1981a does not define "compensatory damages," that phrase, like "punitive damages," has a long common law pedigree. *Carey v. Piphus*, 435 U.S. 247, 257 (1978). Thus, following *Molzof*, we apply the "cardinal rule of statutory construction" that when "'Congress borrows terms of art'" with such deep roots, Congress "'presumably knows and adopts'" the "'widely accepted definitions.'" *Molzof*, 502 U.S. at 307 (quoting *Morissette*, 342 U.S. at 246); *accord Cooper Indus., Inc. v. Leatherman Tool*, 532 U.S. 424, 432 (2001). And the well-established meaning of "compensatory damages" at common law encompasses damages that, in accordance with the collateral source rule, decline to deduct insurance benefits.

At common law, "'[c]ompensatory damages' are the damages awarded to a person as compensation, indemnity or restitution for harm sustained." *Restatement (Second) of Torts* § 903. They are such damages "as will compensate the injured party for the injury sustained, and nothing more; such as will simply make good or replace the loss caused by the wrong or injury." *Compensatory Damages,* Black's Law Dictionary 390 (6th ed. 1990). The phrase "compensatory damages" can also be synonymous with "actual damages," *Cooper*, 566 U.S. at 306–07, which *Black's Law Dictionary* defines to mean "compensation for [an] actual and real loss or injury, as opposed on the one hand to 'nominal' damages, and on the other to 'exemplary' or 'punitive' damages," *Actual Damages*, Black's Law Dictionary 390 (6th ed. 1990).

These definitions make clear that compensatory damages are based on the "injury sustained." In that respect, they can be read to support applying the collateral source rule: When a claimant incurs medical expenses, those expenses are a measure of the harm sustained and remain so regardless of whether the claimant receives reimbursement. But the definitions also suggest that compensatory damages "make good or replace the loss"—something that arguably would not be necessary if an injured individual has received payment from a collateral source.

The history of compensatory damages, however, resolves any ambiguity by definitively showing that damages calculated pursuant to the collateral source rule were compensatory damages as the common law understood that idea. We have already explained that the rule was "well established at common law" when *The Propeller Monticello* applied it in 1855 and that, in the nearly 170 years since, it has remained the settled common law rule for calculating damages. *Supra* Part I.B. But more than that, the collateral source rule has long constituted the common law's default for calculating *compensatory damages*. Take, for example, the Supreme Court's second encounter with the rule in *The Atlas*, 93 U.S. 302 (1876). In that case, which also concerned ship collisions, the Court began with the proposition that "the measure of compensation" for the faultless ship (a canal boat damaged in a collision) should "be equal to the amount of injury received." *Id.* at 310. Then, the Court held that the at-fault ships (two tug boats that caused the collision) were not "entitled to deduct . . . any sum which the [faultless ship] has received from an underwriter on account of the same injury." *Id.* And the Court explained that this did not offend the rule that "[n]one can recover compensation twice in respect of the same injury." *Id.* That was because "what the plaintiff recovers under his policy of insurance is not compensation for damages, but a payment under a contract independent of the claim against the wrong-doer." *Id.*

This reasoning explains why the collateral source rule applies to compensatory damages: "insurance is an indemnity," not compensation for harm. *Id*. Hence, the collateral source rule simply declares that, by the common law's lights, it is "none of the defendant's business" that the plaintiff may have been able to defray those costs using insurance, government benefits, or gifts. Dobbs et al., *Law of Torts* § 482. Indeed, the Supreme Court reaffirmed the same principle in 1951 when it emphasized that "[t]o decline to deduct state unemployment compensation benefits in computing back pay is not to make the employees more than whole" where "payments to the employees were not made to discharge any liability or obligation of respondent." *NLRB v. Gullett Gin Co.*, 340 U.S. 361, 364 (1951).

Cases like *The Atlas* and *Gullett Gin* are consistent with a long line of sources that have understood the collateral source rule as incorporated into the measure of compensatory damages at common law. The 1939 *Restatement (First) of Torts*, for example, embraces the rule when dis-

cussing "compensatory damages for specific types of harm," stating that "[t]he value of medical services made necessary by [a] tort can ordinarily be recovered although they have created no liability or expense to the injured person." *Restatement (First) of Torts* § 924 cmt. c (Am. L. Inst. 1939); *see id.* Introduction, p. viii (explaining that the Restatement aimed to "present an orderly statement of the general common law of the United States"). Likewise, the *Restatement (Second) of Torts* describes the rule as reflecting "the tortfeasor's responsibility to compensate for all the harm that he causes, not confined to the net loss that the injured party receives." *Restatement (Second) of Torts* § 920A cmt. b. Another leading contemporary treatise discusses "the traditional rule . . . that compensation from 'collateral sources' . . . does not go to reduce the defendant's obligation to pay damages." Dobbs et al., *Law of Torts* § 482.

Moreover, the specific type of collateral payments that spurred USDA's request to our Office—medical expenses covered by health insurance—have long been a paradigm case for the rule: "The usual case" for the rule "is one in which plaintiff is injured by defendant's tort but suffers no actual medical expense loss because those expenses are paid for by plaintiff's own medical insurance." Dobbs & Roberts, *Law of Remedies* § 3.8. And "[i]n these cases, the rule is quite firm that defendant must pay for the reasonable value of medical services reasonably required even though plaintiff's own insurance has paid for such services." *Id.*

"This, then, is the background against which Congress legislated in enacting Title VII, and these are the default rules it is presumed to have incorporated, absent an indication to the contrary in the statute itself." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013) (relying on common law default rules to define the causation standard for Title VII retaliation claims); *see Molzof*, 502 U.S. at 307. We therefore think it clear that when section 1981a permits the award of "compensatory damages," it does not require the exclusion of medical costs paid by a claimant's health insurance.[2]

---

[2] USDA highlights cases suggesting that the collateral source rule applies to actions based in tort but may not apply in some contract actions. *See* June 2 USDA Memo at 5 (citing, for example, *Jaffe v. Demich*, No. 16-CV-0245, 2018 WL 4252416, at *7 (S.D. Ca. Sept. 6, 2018); *Green Constr. Co. v. Kan. Power & Light Co.*, 759 F. Supp. 740, 744 (D. Kan. 1991), *aff'd*, 1 F.3d 1005 (10th Cir. 1993); *Travelers Cas. and Sur. Co. v. Dunmore*, No. CIV. S-07-2493, 2010 WL 5200940, at *7 (E.D. Ca. Dec. 15, 2010);

**2.**

Statutory structure and history reinforce our view that "compensatory damages" include awards that do not deduct medical costs covered by health insurance. In addition to generally authorizing compensatory damages, section 1981a also sets forth "[e]xclusions from compensatory damages." 42 U.S.C. § 1981a(b)(2) (heading). Specifically, "[c]ompensatory damages . . . shall not include backpay, interest on backpay, or any other type of relief authorized under" certain other remedial provisions. *Id.* § 1981a(b)(2). Section 1981a also imposes "[l]imitations" on "the amount of compensatory damages" and specifies that awards "for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses," together with "punitive damages . . . , shall not exceed" designated caps. *Id.* § 1981a(b)(3). Finally, section 1981a expressly precludes damages where recovery is available under 42 U.S.C. § 1981, which "forbid[s] all 'racial' discrimination in the making of private as well as public contracts." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987) (citation omitted); *see* 42 U.S.C. § 1981a(a)(1). Section 1981a, however, does not exclude awards calculated based on the collateral source rule from recoverable compensatory damages. Nor does it impose any caps on recoveries for *past* pecuniary costs, which clearly encompass healthcare costs.

The absence of any such limits, moreover, is particularly significant set against the 1991 legal landscape. Federal courts at the time were routinely applying the collateral source rule under the pre-1991 Title VII provisions authorizing back pay and other equitable relief. *See, e.g.*, *EEOC v. Ford Motor Co.,* 645 F.2d 183, 195 (4th Cir. 1981) (applying collateral source

---

*Melendez v. Colo. Cas. Ins. Co.*, No. 12-CV-46, 2013 WL 7201117, at *3 (D. Wy. Apr. 11, 2013)). The damages that section 1981a authorizes for Title VII violations, however, are not aptly analogized to contract damages; they are far more like tort. In *United States v. Burke*, 504 U.S. 229 (1992), the Supreme Court held that recoveries under the pre-1991 version of Title VII did not constitute "a tort-like 'personal injury'" recovery largely because Title VII then did "not allow awards for compensatory or punitive damages," *id.* at 238. *Burke* "contrast[ed]" the pre-1991 Title VII with Title VIII, "whose fair housing provisions allow for jury trials and for awards of compensatory and punitive damages" and therefore "sounds basically in tort." *Id.* at 240 (quoting *Curtis v. Loether*, 415 U.S. 189, 195 (1974)). By analogy, the compensatory and punitive damages authorized by section 1981a likewise sound in tort.

rule to hold that unemployment compensation may not be deducted from a Title VII back pay award), *rev'd on other grounds,* 458 U.S. 219 (1982); *Brown v. A.J. Gerrard Mfg. Co.*, 715 F.2d 1549, 1550 (11th Cir. 1983) ("[T]he deduction of unemployment payments from Title VII back pay awards should be consistently disallowed."). True, there was some disagreement around the margins concerning whether particular types of payments (like unemployment benefits) were collateral or direct and whether, when adjudicators exercised equitable powers, applying the collateral source rule was mandatory or discretionary. *See, e.g.*, *Kauffman v. Sidereal Corp.*, 695 F.2d 343, 347 n.2 (9th Cir. 1982) (noting open question as to whether employer-funded unemployment benefits are collateral); *Hunter v. Allis-Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1428 (7th Cir. 1986) (holding that "it is within the discretion of the district judge whether to deduct unemployment benefits from backpay," but noting that the majority of circuits hold that unemployment benefits may never be deducted). But given this history, we think it unlikely that when Congress in 1991 expanded Title VII remedies by authorizing compensatory damages, it intended to supplement section 1981a's express statutory limitations with an additional unwritten exception entirely precluding the application of the collateral source rule.

This understanding of section 1981a finds further support in the 1991 state-level landscape. The collateral source rule generated substantial policy debate, and many jurisdictions limited its application in certain types of actions (like medical malpractice or product liability) or against certain types of defendants (like public entities)—and some largely abrogated it (though even these jurisdictions generally continued to apply the doctrine when subrogation or reimbursement rights existed and the doctrine thus was unlikely to yield recovery that might be thought excessive). *See* Daena A. Goldsmith, *A Survey of the Collateral Source Rule: The Effects of Tort Reform and Impact on Multistate Litigation*, 53 J. Air L. & Com. 799, 806–08, 816, 819 (1988). Although these changes might be thought to show a weakening of the collateral source rule, we think they further undermine USDA's position. These reforms underscore that the collateral source rule has endured unless and until legislatures have expressly displaced the rule—and that Congress, despite these state models, chose not to do so in section 1981a even as it limited recoverable damages in other respects.

USDA observes that the legislative history of the Civil Rights Act of 1991 does not contain "any reference to, or debate concerning," the collateral source rule. USDA July 28 Memo at 2–3. But giving weight to this legislative silence would undermine rather than support USDA's position: Even as the collateral source rule remained the common law's well-settled default leading up to the 1991 Act's passage, and even as some states at that time had modified the rule by statute, no one in Congress appears to have suggested that the 1991 Act departed from that default. In all events, the Supreme Court has cautioned that "just as it is error to displace sovereign immunity based on inferences from legislative history without clear statutory direction . . . , so it is error to grant sovereign immunity based on inferences from legislative history in the face of clear statutory direction waiving that immunity." *Kirtz*, 144 S. Ct. at 471. So USDA's arguments are doubly unavailing.

For all these reasons, we think this case is an apt one for the rule that "[w]here Congress explicitly enumerates certain exceptions to a general [rule], additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (quoting *Andrus v. Glover Const. Co.*, 446 U.S. 608, 616–17 (1980)). Indeed, even though Congress in some sense disfavored future pecuniary damages and nonpecuniary damages, it allowed their recovery (subject to limits). Yet USDA's view would entirely exclude damages calculated pursuant to the collateral source rule even where subrogation or reimbursement rights exist—an approach that, as far as we are aware, no jurisdiction has adopted.

### 3.

Finally, other federal statutes provide further support for our view. *Cf. Cooper*, 566 U.S. at 292–93 (looking to usage of "actual damages" in other statutes). At least twice, Congress has expressly addressed compensation and the collateral source rule together in the same statute. In the Justice for United States Victims of State Sponsored Terrorism Act, Congress created a fund for certain victims of state-sponsored terrorism but specified that applicants who had received "any payment [of at least] 30 percent of the *total compensatory damages* owed to such applicant . . . *from any source other than this Fund* shall not receive any payment from the Fund" until other eligible applicants had received at least 30 percent

of their own compensatory damage awards. Pub. L. No. 114-113, § 404(b)(3)(B)(i), 129 Stat. 2242, 3007, 3011 (emphasis added). The statute defines "any source other than the Fund" to include "all collateral sources, including life insurance, pension funds, death benefit programs, payments by Federal, State, or local governments, and court awarded compensation related to the act of international terrorism that gave rise to a claimant's final judgment." *Id.* § 404(j)(6), 129 Stat. at 3016–17. In addition, in the September 11th Victim Compensation Fund of 2001, Congress directed a special master to provide "compensation" to eligible individuals but specified that the special master "shall reduce the amount of compensation . . . by the amount of the collateral source compensation the claimant has received or is entitled to receive." Pub. L. No. 107-42, § 405(b)(6), 115 Stat. 230, 237, 239. A "collateral source" includes "all collateral sources, including life insurance, pension funds, death benefit programs, and payments by Federal, State, or local governments related to the terrorist-related aircraft crashes of September 11, 2001." *Id.* § 402(4), 115 Stat. at 237.

These statutes underscore that Congress knows how to express its intention to depart from the common law default concerning collateral sources. As important, the exclusions from these statutes presuppose that measures of compensation in the first instance will by default include (for example) healthcare costs that are covered by insurance. Otherwise, it would not make sense to specify that payments from such collateral sources would defray part of "the total compensatory damages owed," Pub. L. No. 114-113, § 404(b)(3)(B)(i), 129 Stat. at 3011, or "reduce the amount of compensation" otherwise owed, Pub. L. No. 107-42, § 405(b)(6), 115 Stat. at 239.

## III.

USDA advances two additional arguments for why EEOC must deduct FEHB health insurance benefits from a claimant's past pecuniary damages. Below, we explain why we disagree with each.

## A.

First, as USDA observes, the collateral source rule does not apply to "direct" payments—that is, when the "defendant, or someone acting on

behalf of a defendant, makes a payment to . . . plaintiff, in full or partial compensation for plaintiff's losses." *Restatement (Third) of Torts: Remedies* § 10 cmt. d; *see Restatement (Second) of Torts* § 920A ("If a tort defendant makes a payment toward his tort liability, it of course has the effect of reducing that liability."). And here, USDA argues that payments by FEHB are direct because the government "pays over half of the annual cost of the FEHB program" and the Office of Personnel Management ("OPM") "exercises extensive control over FEHB." July 28 USDA Memo at 3 & n.4.

USDA's arguments, however, do not show that payments by FEHB insurers are "direct" under the collateral source rule. Even when an employer-defendant has contributed to a benefit or paid for it entirely, courts generally look to "the exact nature" of the benefit to determine whether it is collateral. *Sloas v. CSX Transp., Inc.*, 616 F.3d 380, 390 (4th Cir. 2010) (quoting *United States v. Price*, 288 F.2d 448, 449 (4th Cir. 1961)). If a benefit is "part-and-parcel of . . . employees' compensation package," as with "fringe benefits or deferred compensation," courts generally deem the payments collateral, even if the employer has contributed a portion of the cost. *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1244–45 (5th Cir. 1994). By contrast, if the employer-defendant "provides a benefit to the plaintiff 'specifically to compensate him for his injury,'" *Sloas*, 616 F.3d at 390 (quoting *Price*, 288 F.2d at 449), or as "a prophylactic measure against liability," *Davis*, 18 F.3d at 1244–45, then the benefit may be direct.

Here, while the federal government pays a substantial portion of the cost of the FEHB program, FEHB benefits are clearly part of the "comprehensive compensation and benefits package" that the government provides to employees. Office of Personnel Management, *Federal Employee Compensation Package*, https://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/fact-sheets/federal-employee-compensation-package/ (last visited July 5, 2024). Nothing in the facts available to us suggests that their primary purpose is to provide coverage in the event that the employing agency tortiously causes injury. *See, e.g.*, *Hall v. Minn. Transfer Ry. Co.*, 322 F. Supp. 92, 97 (D. Minn. 1971) ("[W]here the insurance policy is one of general hospital and medical coverage upon which the insured may make claim without regard to liability on the part of the employer, such a policy is a fringe benefit maintained by the employer and is in effect part of the employee's income for services rendered[.]"). And as to

OPM's "extensive control over FEHB," USDA does not cite—and we have not found—any case that has deemed "control" relevant to whether a source is direct or collateral. Nor does such control appear to bear on the key question that courts have asked: whether a benefit is "part-and-parcel of . . . employees' compensation package," or instead "a prophylactic measure against liability." *Davis*, 18 F.3d at 1244–45; *see Sloas*, 616 F.3d at 390. USDA's arguments thus do not persuade us that payments by FEHB insurers are "direct" and fall outside the collateral source rule.

## B.

Second, USDA asserts that awarding compensatory damages under the collateral source rule conflicts with EEOC's guidance documents, which USDA argues EEOC must follow under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). *See* June 2 USDA Memo at 4–5. But we do not share USDA's reading of EEOC's guidance documents, and hence we need not weigh whether those documents, if read as USDA does, would bind EEOC under *Accardi*.

The two relevant documents are EEOC's *Enforcement Guidance: Compensatory and Punitive Damages Available Under Sec. 102 of the CRA of 1991* (July 14, 1992), https://www.eeoc.gov/laws/guidance/enforcement-guidance-compensatory-and-punitive-damages-available-under-sec-102-cra ("EEOC's Enforcement Guidance"), and the *Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO-MD-110)* (Aug. 5, 2015), https://www.eeoc.gov/sites/default/files/migrated_files/federal/directives/md-110.pdf ("MD-110"). Both documents explain that employees who establish a claim of discrimination under the relevant statutes may receive compensatory damages. Then, these documents explain that "[c]ompensatory damages include damages for past pecuniary loss (out-of-pocket loss), future pecuniary loss, and nonpecuniary loss (emotional harm)." *EEOC's Enforcement Guidance* § II.A; *accord* MD-110, at 11-20.

Principally, USDA contends that the references to "out-of-pocket" expenses preclude EEOC from applying the collateral source rule by excluding amounts paid or reimbursed by other sources. July 28 USDA Memo at 4; June 2 USDA Memo at 2–5. These references, however, are too thin a reed to conclude that EEOC departed from centuries of common law history and barred itself from awarding damages via the collat-

eral source rule—a rule that, as we have explained, EEOC has applied for more than 30 years. EEOC's Enforcement Guidance instead seems to use "out-of-pocket loss" as a shorthand for "past pecuniary damages," which encompasses damages awarded pursuant to the collateral source rule, and to distinguish such damages from harder-to-measure "future pecuniary loss" and "nonpecuniary loss." *See* EEOC's Enforcement Guidance § II.A.1. The MD-110 is similar. *Compare* MD-110, at 11-23 ("Pecuniary losses are out-of-pocket expenses incurred as a result of the agency's unlawful action, including job-hunting expenses, moving expenses, medical expenses, psychiatric expenses, physical therapy expenses, and *other quantifiable out-of-pocket expenses*." (emphasis added)), *with id.* at 11-21 ("Non-pecuniary damages are losses that are *not subject to precise quantification* including emotional pain and injury to character, professional standing, and reputation." (emphasis added)).

Alternatively, USDA argues that the MD-110's express reference to the collateral source rule in the context of back pay indicates that EEOC "only recognizes the collateral source rule to avoid deductions in backpay stemming from unemployment compensation," June 2 USDA Memo at 4, and precludes USDA from applying the rule "to other remedies, such as past pecuniary damages," *id.* at 4 n.3; *see also* July 28 USDA Memo at 4 n.5.

We again disagree. The MD-110's express discussion of this general principle in one context does not imply that the principle does not apply elsewhere. That is particularly true because EEOC had good reason to focus on this issue in the back pay context. The statute authorizing back pay provides that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1); *see id.* § 2000e-16(d) (making section 2000e-5(g) applicable in actions against the federal government). This carve-out thus requires EEOC to decide whether certain sources that might be characterized as "interim earnings"—including unemployment compensation and awards under the Federal Employees' Compensation Act—should reduce a back pay award, despite the collateral source rule. *See, e.g.*, MD-110, at 11-4 to 11-5. And while we express no opinion on whether EEOC has correctly interpreted the carve-out in 42 U.S.C. § 2000e-5(g)(1), this provision explains why its guidance grapples expressly with the collateral source rule as to back pay and not as to other remedies.

## IV.

For these reasons, we conclude that Congress has authorized EEOC to award past pecuniary damages pursuant to the collateral source rule without deducting medical costs covered by FEHB insurance and that EEOC's guidance does not preclude it from doing so.

CHRISTOPHER C. FONZONE
*Assistant Attorney General*
*Office of Legal Counsel*
